[No. 43437-3-I. Division One. January 31, 2000.]

JOHN DOE, *Respondent*, v. GONZAGA UNIVERSITY, ET AL.,
*Appellants*.

*Charles Kenneth Wiggins* and *Kenneth Wendell Masters*, for appellants.

*Lauren Hobbs Siddoway*, for respondent.

APPELWICK, J. — John Doe, a former student in Gonzaga University's department of education, sued Gonzaga and three of its staff members for spreading allegations that Doe had sexually assaulted another student, and for refusing to submit a moral character affidavit supporting Doe's application for teacher certification. The primary issues before us on appeal are whether any of the defendants can be liable for allegedly defamatory statements that Gonzaga employees made only to one another, and whether Gonzaga was entitled to judgment as a matter of law on Doe's claims for negligence, breach of educational contract, invasion of privacy, and violation of 42 U.S.C. § 1983. Holding in favor of Gonzaga on these issues, we reverse and remand for a new trial on the defamation claim only. We also reverse certain of the trial court's discovery and evidentiary rulings.

## FACTS

On October 5, 1993, Roberta League, the certificate specialist in Gonzaga's school of education, overheard Gonzaga student Julia Lynch telling a friend the following:

> [W]hen I was an RA, my resident, [Jane Doe], was in obvious physical pain. She couldn't eat, she couldn't sleep, and she was having blood in her urine, stomach cramps, she said it was a result of having sex with [John Doe], this man she has been seeing, and no one from the school bothered to ask her any

questions or find out what really happened. They had a little bit of information that she was hurt and tucked it away.

The conversation concerned League because John Doe, a student in the school of education, was at that time student teaching. Soon afterward, League discussed the matter with Dr. Susan Kyle, the director of field experience for student teachers at Gonzaga.

Kyle and League decided that they needed to investigate the situation further. They were concerned that the allegations League had overheard about John Doe might affect the dean's ability to submit an affidavit supporting Doe's application for teacher certification. Pursuant to RCW 28A.410.010, the Washington State Board of Education has promulgated rules governing the teacher certification process. *See* WAC 180-77, 180-78, 180-86, 180-87, and former 180-75. The rules require a designated official from a certification applicant's school to contact several members of the faculty who know or knew the applicant. The dean must then swear that he or she and the faculty members consulted have "no knowledge that the applicant has been convicted of any crime and [have] no knowledge that the applicant has a history of any serious behavioral problems." Former WAC 180-75-082(3).[1]

On October 14, 1993, Kyle and League met with Lynch. According to written declarations that Kyle and League drafted in February 1994, which were admitted at trial, Lynch told them that Jane Doe had admitted to her that John Doe had sexually assaulted her three times, in late November or December, 1992. Lynch said further that Jane Doe had claimed that John Doe verbally coerced her into participating in "aberrant sexual behavior" with "other objects besides his penis," and had urged her to engage in multiple partner sex. Lynch told League and Kyle that she

---

[1]WAC 180-75-082 was repealed, effective March 8, 1997. It was replaced by WAC 180-79A-155, which similarly requires a teacher candidate to submit a moral character affidavit from the school of education in support of the application for certification. The change in the law does not affect the outcome in this case.

had accompanied Jane Doe to the health center soon after the sexual assaults, and that the nurse had concluded that Jane Doe was date raped. At trial, however, Lynch testified that the behaviors Jane Doe had described to her were in fact normal, nonaberrant sexual activities, and that she did not remember telling League and Kyle about foreign objects. Lynch further testified that she did not remember whether Jane Doe had told her that John Doe said he wanted to sleep with more than one person at a time, only that she told her that he wanted to sleep with both Jane Doe and another girl friend of his. League admitted at trial that Lynch told her in the October 1993 meeting that Jane Doe had denied the rape allegations when Lynch spoke to Jane Doe in December 1992.

At the meeting with Kyle and League, Lynch agreed to approach Jane Doe. When she did, Jane Doe became angry and told Lynch that she did not want to pursue a rape charge.

Soon after conferring with Kyle, League telephoned Adelle Nore, a senior investigator with the Office of the Superintendent of Public Instruction (OSPI), which regulates teacher education programs. All together, Gonzaga personnel contacted Nore on at least six occasions in relation to the allegations against John Doe. During this initial conversation, League told Nore that a teacher education student had possibly date raped another student. League identified John Doe by name in a subsequent telephone call. Nore advised League to "talk to the girl who made the date rape charge in person." In her notes, Nore recorded that League had informed her that the "girl" was willing to come forward. Nore testified that her consistent understanding in her conversations with League and Kyle, was that the victim was credible and prepared to make a statement.

On October 28, 1993, Kyle met with Jane Doe, and told her about the date rape allegations. According to Kyle, Jane Doe would not comment on the relationship, and stated, "I guess I don't really know what rape is," and, "I

promised [John Doe] I wouldn't tell. He made me promise."
Jane Doe refused to make a formal statement.

Immediately after leaving Kyle's office, Jane Doe met
with Professor William Sweeney. According to Sweeney,
Jane Doe was "near hysteria" and weeping uncontrollably.
Sweeney testified that Jane Doe told him during the meet-
ing that John Doe had sexually assaulted her on three oc-
casions, each time more and more violent and abusive, and
that she had screamed and tried to get away. According to
Sweeney, Jane Doe also said that John Doe repeatedly
threatened her life, and that she did not believe the
university could protect her from him.

On January 26, 1994, Jane Doe met with Janet Burcalow,
chair of the department of teacher education. Jane Doe
tried to persuade Burcalow not to pursue the matter. But
according to Burcalow, Jane Doe refused to say that noth-
ing serious had happened in the relationship, and admitted
being afraid of what might happen if John Doe found out
she had talked about their relationship.

Cheryl Lepper, an instructor in the teacher education
department, testified that Jane Doe had told her about the
sexual assaults in the spring of 1993. According to Lepper,
Jane Doe said that John Doe had restrained her and forced
her to have sex, and had then stalked her after she broke
up with him.

Some time in February 1994, Dr. Corrine McGuigan, the
dean of the school of education, met with Kyle, Burcalow,
League, and Sweeney. The dean concluded after the meet-
ing that sufficient evidence of a serious behavioral problem
precluded her from signing the affidavit supporting John
Doe's application for teacher certification.

John Doe did not hear about Gonzaga's investigation
into the date rape allegations until March 4, 1994. On that
date, Doe was called into Dean McGuigan's office, where he
was escorted to a private room, and left to read a letter
that the dean had signed. The letter informed Doe that the
dean would not give him the moral character affidavit
required to support his application for certification to teach,

due to the sexual assault allegations. Doe was not told who had made the allegations.

John Doe sued Jane Doe for defamation, and Gonzaga for defamation, negligence, breach of educational contract, and violation of 42 U.S.C. § 1983 for releasing his name to OSPI in violation of the Family Educational Rights and Privacy Act (FERPA). Two years later, John Doe sued Lynch, League and Kyle separately. The two actions were consolidated.

Jane Doe counter-claimed against John Doe for sexual assault. John Doe and Jane Doe settled their lawsuit in 1996, dismissing their claims against each other.

A jury trial was held between March 17 and April 1, 1997 on the remaining claims. In response to pretrial and trial motions, the trial court made several rulings that are at issue in this appeal. The court admitted several documents that Gonzaga personnel had prepared at the request of corporate counsel, over Gonzaga's objections that the documents were protected by attorney-client privilege. The court refused to admit the settlement agreement between John Doe and Jane Doe. The court also refused to admit the testimony of two witnesses who came forward after trial had begun; both witnesses would have testified that Jane Doe had told them that she had been sexually assaulted by a boyfriend. Gonzaga offered the evidence not to prove the truth of the allegation, but to impeach Jane Doe's testimony that she had not used the terms "rape" or "date rape."

By the time of trial, Jane Doe had moved to North Carolina and was unwilling to attend. Instead, John Doe presented Jane Doe's testimony through a 1997 videotaped deposition, portions of which were shown to the jury. In both the videotaped testimony and an earlier 1995 deposition, Jane Doe essentially denied both that John Doe had sexually assaulted her, and that she had made most of the statements that Gonzaga personnel attributed to her. Specifically, in her videotaped testimony, Jane Doe testified that Lynch had "really blown things out of proportion," and

that there were "wild things" and other falsehoods in Kyle's, Sweeney's, and Burcalow's testimonies. She denied speaking to Cheryl Lepper, using the word "rape," or being afraid for her life. Jane Doe testified that she had tried to dissuade Kyle and Burcalow from pursuing the allegations, but that the two women were "trying to get me to agree that this had happened," and were uninterested in hearing anything other than what they already believed. Jane Doe admitted, however, that some things had happened in her relationship with John Doe which had made her uncomfortable.

The jury returned a verdict for John Doe on all five theories of recovery. The jury awarded damages in the following amounts:

| | |
|---|---|
| Defamation | $500,000 |
| Invasion of privacy | $100,000 |
| Violation of FERPA | $150,000 |
| Punitive damages under FERPA | $300,000 |
| Breach of educational contract | $55,000 |
| Negligence | $50,000 |
| **Total** | $1,155,000 |

The jury was not instructed to segregate the damages, and did not specify which of Gonzaga's wrongful behaviors gave rise to which damages. Gonzaga now appeals.

## DEFAMATION

### A. *Prins* Instruction

The first issue before us is whether the trial court properly instructed the jury regarding the defamation claim. Gonzaga asked the court to instruct the jury that neither Gonzaga nor the individual defendants could be liable for communications made only among Gonzaga personnel. The court rejected the instruction. We hold that the court's decision was in error.

■ Jury instructions are sufficient if they permit each party to argue his or her theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law. *State v. Rice*, 110 Wn.2d 577, 603, 757 P.2d 889 (1988).

Communications made only among corporate personnel are not published for the purposes of defamation. *Prins v. Holland-North Am. Mortgage Co.*, 107 Wash. 206, 208, 181 P. 680, 5 A.L.R. 451 (1919). In *Prins*, the court held that a letter from one officer of a corporation to another did not constitute publication because a corporation acting through its agents and employees "is but communicating with itself." 107 Wash. at 208.

■ Consistent with the *Prins* rule, Gonzaga University could not be liable for any defamatory communications made only among its employees. Here, the rule shields the individual defendants as well; after all, the corporation can speak to itself only through the individuals who work for it. Therefore, the trial court erred in rejecting Gonzaga's proposed *Prins* instruction.

Moreover, the court's error was not harmless. Testimony at trial focused primarily on the communications that Gonzaga personnel made only among themselves. The only allegedly defamatory statements that fall outside the *Prins* exception are those made to Adelle Nore at OSPI. Because the error was not harmless, we reverse the defamation award and remand for a new trial on that claim. On remand, the trial court is instructed to give the jury a *Prins* instruction.

## B. Actual Malice Instruction

Gonzaga also contests the trial court's defamation jury instructions on the ground that they misstate the standard for determining whether the communications at issue were protected by a qualified privilege. John Doe responds that the error was not properly preserved because Gonzaga's proposed instruction was deficient.

■ A claim that the trial court has applied an incorrect

standard of proof under the First Amendment may be considered for the first time on appeal, because it is an issue affecting fundamental constitutional rights. *Richmond v. Thompson*, 130 Wn.2d 368, 385, 922 P.2d 1343 (1996). Therefore, even if Gonzaga's proposed instruction was deficient, it may raise the issue for the first time on appeal.

Here, Gonzaga had a qualified privilege to make the allegedly defamatory statements at issue. The WAC provision governing Gonzaga's role in the teacher certification process, gives Gonzaga a qualified privilege to contact several members of the faculty and staff about an applicant's potential behavioral problems. *See* WAC 180-79A-122(3). This same provision also implicitly grants Gonzaga a qualified privilege to seek guidance from OSPI regarding the certification process. If not for this qualified privilege, schools like Gonzaga would be discouraged from investigating claims of a future teacher's potential behavioral problems. The ultimate purpose of the qualified privilege is to protect school children.

 When a defendant like Gonzaga has a qualified privilege to communicate potentially defamatory statements, the privilege may be lost by showing that the defendant made the statements with actual malice. *Parry v. George H. Brown & Assocs., Inc.*, 46 Wn. App. 193, 197, 730 P.2d 95 (1986); *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 342, 760 P.2d 368 (1988). Actual malice exists when a statement is made with knowledge of its falsity or with reckless disregard of whether it was false or not. *Richmond*, 130 Wn.2d at 376. "[R]eckless disregard" is a subjective standard, and requires the plaintiff to prove that the speaker "acted with a high degree of awareness of [the statement's] probable falsity, or in fact entertained serious doubts as to [its] truth." *Story*, 52 Wn. App. at 343. A plaintiff cannot show actual malice by merely showing that a defendant unreasonably failed to investigate the truth of a statement. *See Parry*, 46 Wn. App. at 197. But when a speaker does in fact conduct an investigation and the investigation does not support the false statement or brings

to the speaker's attention facts that rebut the false statement, that is evidence from which a jury can infer reckless disregard. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 776 P.2d 98 (1989).

Here, the court correctly instructed the jury that the statements at issue were protected by a qualified privilege, and that John Doe had to prove by clear and convincing evidence that Gonzaga had made the statements with actual malice. The jury was further instructed that, "abuse of privilege occurs if the maker of the allegedly false and defamatory statement knew, at the time the statement was made, that the statement was false, or acted with reckless disregard as to the truth or falsity of the statement." But the court did not define "reckless disregard" for the jury. Gonzaga argues that the court's instruction is deficient because it failed to make clear to the jury that "reckless disregard" is a subjective standard. Gonzaga contends that the jury could have incorrectly inferred that an unreasonable failure to investigate the truth of the date rape allegations was evidence of recklessness.

Gonzaga's argument is well taken. On remand, the court is directed to instruct the jury regarding the subjective nature of the "reckless disregard" standard.

## SECONDARY CLAIMS

Gonzaga next argues that the trial court erred in failing to grant it a directed verdict on the remaining claims of negligence, invasion of privacy, violation of 42 U.S.C. § 1983, and breach of educational contract. In reviewing a trial court's decision to deny a motion for directed verdict, we apply the same standard as the trial court. A directed verdict is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party. *Industrial Indem. Co. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990).

## A. Negligence

■ Gonzaga asserts it is immune from liability for negligent reporting about John Doe, pursuant to RCW 4.24.510. We agree with John Doe that this claim is an affirmative defense which may not be raised for the first time on appeal. We do not decide that the defense does or does not have application to these facts.

Gonzaga next argues that it cannot be liable for negligence in this case because it had no duty to John Doe to exercise reasonable care in collecting information regarding his potential behavioral problems. John Doe responds that we should create or extend such a duty. There are no cases interpreting the WAC provision that governs Gonzaga's role in the teacher certification process, to guide us in addressing this issue.

The WAC provision authorizing Gonzaga to collect information regarding a teacher certification candidate's potential behavioral problems does not expressly impose a duty on the university to investigate formally any unfavorable allegations that arise. *See* former WAC 180-75-082. To the contrary, former WAC 180-75-082 requires only that a designated official of an applicant's school contact several faculty members who know or knew the applicant. Only if both the school official and the faculty members consulted have "no knowledge that the applicant has a history of any serious behavioral problems" may the dean sign an affidavit under penalty of perjury supporting the candidate's application. Former WAC 180-75-082.

In arguing that Gonzaga owed him a duty to investigate, John Doe analogizes the present case to several cases that address Department of Social and Health Services (DSHS) caseworkers' duties in reporting child abuse allegations. In those cases, Washington courts held that caseworkers have a duty to exercise reasonable care when investigating child abuse allegations. But the caseworker cases are distinguishable because a statute and administrative regulations impose a duty to investigate on caseworkers. *See Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 273,

921 P.2d 1066 (1996) ("[A] specific statute provides that DSHS caseworkers have a duty to investigate. RCW 26.44.050. A cause of action for negligent investigation thus exists against DSHS caseworkers."); *Yonker v. Department of Soc. & Health Servs.*, 85 Wn. App. 71, 81-82, 930 P.2d 958 (1997) (RCW 26.44.050 imposed duty to investigate reports of possible occurrence of child abuse); *Dunning v. Pacerelli*, 63 Wn. App. 232, 239, 818 P.2d 34 (1991) (DSHS caseworkers potentially liable for negligent investigation into allegations of child abuse).

In the alternative, John Doe contends that Gonzaga did undertake an investigation in this case, and that once it began the investigation, it owed a duty to Doe not to be negligent. But the cases that Doe cites in support of this argument are not on point. In those cases, the courts held that a person who chooses to assist another, even gratuitously, inducing reliance on that assistance, may be liable for failure to exercise reasonable care. *See Alston v. Blythe*, 88 Wn. App. 26, 943 P.2d 692 (1997); *Roth v. Kay*, 35 Wn. App. 1, 664 P.2d 1299 (1983); *Sheridan v. Aetna Cas. & Sur. Co.*, 3 Wn.2d 423, 100 P.2d 1024 (1940). These principles are inapplicable here because Gonzaga did not undertake to render aid or warn John Doe.

Former WAC 180-75-082 requires the applicant for certification to submit an affidavit about the applicant's criminal history, serious behavioral problems and past teaching history. The applicant must also submit an affidavit of good moral character and personal fitness from the designated official at the school of education. The regulation provides that the applicant must submit a statement, as opposed to an affidavit, if it is not possible for the school official to execute an affidavit with the required content. In that statement, the applicant must explain why it is impossible or impractical to obtain the affidavit. In all respects the only duty imposed is on the applicant.

The affidavit from the school of education contemplates signature under penalty of perjury. The school official must attest to contacting "several faculty" who know or knew

the applicant. The regulation does not require contacting all faculty who know or knew the applicant, nor those who know or knew the applicant best, nor even anyone who knew the applicant most recently. The scope of the effort is up to the school.

The affidavit, if filed, must indicate that the affiant and the several faculty contacted have no knowledge that the applicant has not been "convicted of any crime," nor that the applicant has "a history of any serious behavioral problems." The regulation provides no further definition of "crime," "serious behavioral problems" or "knowledge." The answers from the faculty may be wholly subjective as a result. Any consulted faculty member's belief, based on rumor or personal observation that an applicant had a serious behavioral problem, is enough to prevent the execution of the school's affidavit.

Clearly, this regulation does not contemplate the kind of investigation undertaken by child protective services.

■ Schools of education have a vested interest in seeing their graduates certificated. The inability or unwillingness of the school to provide the affidavit is evidence of concerns that overcome this vested interest. These concerns about criminal conduct and serious behavioral problems are issues that OSPI should hear about and should investigate. It is in the interest of schoolchildren and the public to have such reporting by the schools of education and investigation by OSPI.

We find no basis for the creation of a new duty on the part of the school of education to conduct an independent investigation. That is a legislative prerogative that we will not exercise. The judgment on the negligence claim is therefore reversed.

B. Invasion of Privacy

Gonzaga next argues that it is entitled to judgment as a matter of law on the invasion of privacy claim. We hold that the facts here do not support a claim for invasion of privacy.

John Doe's invasion of privacy claim is based on RESTATE-MENT (SECOND) OF TORTS § 652B (1977): "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." The common law right to privacy exists in Washington, and individuals may bring a cause of action for invasion of that right. *Reid v. Pierce County*, 136 Wn.2d 195, 206, 961 P.2d 333 (1998).

■■■ The evidence here is insufficient to support a claim for invasion of privacy. Again, former WAC 180-75-082 authorizes officials from a teacher certificate applicant's school to contact several faculty members regarding the candidate's potential behavioral problems. The provision also implicitly authorizes school officials to consult with OSPI regarding their concerns about particular students. In this process, the school personnel must be able to discuss highly personal matters, which may reasonably be offensive to the certificate candidate in another context. But the candidate waives his right to object to those discussions on the grounds of invasion of privacy once he identifies himself as a potential candidate for teacher certification. Gonzaga did not invade John Doe's privacy to any greater degree than what the WAC provision contemplates. Therefore, we reverse the invasion of privacy judgment.

## C. 42 U.S.C. § 1983

Gonzaga next argues that the court erred in refusing to grant it a directed verdict on the 42 U.S.C. § 1983 claim. Gonzaga argues that it cannot be liable under 42 U.S.C. § 1983 because the federal law at issue, Family Educational Rights and Privacy Act (FERPA), does not create any right or privilege that private individuals can enforce under § 1983. Again, we agree.

■■■ The Federal Civil Rights Act, 42 U.S.C. § 1983, provides for a private cause of action when a state violates certain federal statutory rights. *See Maine v. Thiboutot,*

448 U.S. 1, 4, 100 S. Ct. 2502, 2504, 65 L. Ed. 2d 555 (1980). Section 1983 provides a remedy for violation of federally conferred rights, not simply violation of federal law. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990).

A court must ask three questions in deciding whether a federal statute gives rise to an enforceable right under § 1983: (1) whether the provision in question was intended to benefit the plaintiff; (2) whether the right protected by the statute is so "vague and amorphous" that its enforcement would strain judicial competence; and (3) whether the statute imposes a binding obligation on the state. *Wilder*, 496 U.S. at 509; *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997).

The question before us is whether FERPA creates a federal right that individuals can enforce under § 1983. U.S. Supreme Court case law provides guidance in answering this question. In *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 107 S. Ct. 766, 93 L. Ed. 2d 781 (1987), the Court considered whether the Brooke Amendment gave rise to individual rights enforceable under § 1983. The Brooke Amendment and its implementing regulations imposed a ceiling on the rent which public housing projects could charge low-income tenants. The regulations defined rent to include charges to tenants for " 'reasonable amounts of utilities,' " and defined how that amount would be determined. *Wright*, 479 U.S. at 420-21 n.3, quoting 24 C.F.R. § 860.403 (1982). The Court held that the law was intended to benefit tenants, who could therefore sue to enforce the law under § 1983. *Wright*, 479 U.S. at 432. In *Wilder*, 496 U.S. 498, the Court considered whether the Boren Amendment to the Medicaid Act created individual rights enforceable under § 1983. The Boren Amendment required the states to reimburse Medicaid providers according to rates that were " 'reasonable and adequate' " to meet the costs of " 'efficiently and economically operated facilities.' " *Wilder*, 496 U.S. at 503, quoting 42 U.S.C. § 1396 (1982). Again the Court held that the law

was intended to benefit providers seeking reimbursement, who could therefore challenge the state's rates by suing under § 1983. In both *Wilder* and *Wright*, the laws at issue were enforceable under § 1983 because they were intended to provide particular and well-defined benefits to the plaintiffs.

In two later cases, however, the Court held that certain federal laws did not confer substantive rights on the plaintiffs. In *Suter v. Artist M.*, 503 U.S. 347, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992), the Court considered whether private individuals had the right to enforce by suit a provision of the Adoption Assistance and Child Welfare Act of 1980. The act required participating states to submit a plan to the Secretary of Health and Human Services. The plan had to provide that the state would make "reasonable efforts" to avoid removing children from their homes, and to return children to their homes. *Suter*, 503 U.S. at 351. The Court held that the act did not create an enforceable right under § 1983 because the term "reasonable efforts" imposed "only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary." *Suter*, 503 U.S. at 363. In *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997), custodial parents whose children were eligible to receive child support services from the state pursuant to Title IV-D of the Social Security Act, sued the director of Arizona's child support agency under § 1983. The act required participating states to certify that they would operate a child support enforcement program in "substantial compliance" with the act, and would submit a detailed plan to the Secretary of Health and Human Services. The Court held that the act did not create individual rights enforceable under § 1983 because:

[f]ar from creating an individual entitlement to services, the ["substantial compliance"] standard is simply a yardstick for

the Secretary to measure the systemwide performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied.

*Blessing*, 520 U.S. at 343. In both *Suter* and *Blessing*, the federal laws at issue did not create individual substantive rights enforceable against the states because they were not intended to confer particular benefits on the plaintiffs.

██ The case currently before us is more akin to *Suter* and *Blessing* than to *Wilder* and *Wright*. The federal law at issue, FERPA, provides that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . or personally identifiable information contained therein . . . of students without the written consent of their parents." 20 U.S.C. § 1232g(b). Like the federal law at issue in *Blessing*, FERPA requires participating schools to have in place a system-wide plan; the law is not intended to ensure that "the needs of any particular person have been satisfied." *Blessing*, 520 U.S. at 343. We hold FERPA does not create individual rights privately enforceable under 42 U.S.C. § 1983. Therefore, we reverse the 42 U.S.C. § 1983 judgment.

Furthermore, even if FERPA did create individual rights enforceable under § 1983, we would nonetheless hold that a teacher candidate waives those rights when he or she applies for teacher certification. Former WAC 180-75-082 requires the candidate to file an affidavit from the school of education as a precondition for the state's award of a teacher certificate. In the affidavit, the dean must certify that he or she and several faculty members who know the applicant have "no knowledge that the applicant has a history of any serious behavioral problems." Former WAC 180-75-082. Moreover, the WAC provision implicitly authorizes school officials to contact OSPI directly with questions regarding the certification process. This process necessarily entitles the school to release personally identifiable information to OSPI. Gonzaga's actions did not exceed its authority in this case.

## D. Breach of Contract

Gonzaga finally argues that it is entitled to judgment as a matter of law on the breach of contract claim. Gonzaga argues that any implied agreement between John Doe and Gonzaga does not apply to moral character affidavits. Once again, we agree.

In its student handbook, Gonzaga states that the admission of a student to the university constitutes an "agreement of mutual responsibility." The "student's obligation is to accept the published policies of the University and to act in a manner consistent with these policies." In return, "the University's responsibility is to provide an environment in which the student's educational goals may be achieved." In the same paragraph, Gonzaga further states that it "recognizes its obligation to provide students with an opportunity to be heard in matters affecting their welfare." In another section, the handbook also specifies that the university will follow certain notice and hearing procedures when disciplining students who misbehave. John Doe's theory at trial was that Gonzaga breached this "agreement" by failing to discuss the sexual assault allegations with him before reaching a final decision not to issue him an affidavit.

Without addressing whether the student handbook creates any enforceable substantive or procedural rights with respect to purely internal issues, we hold that the student handbook does not confer substantive or procedural rights with respect to former WAC 180-75-082(3), which governs Gonzaga's responsibilities to the state in regard to the moral character affidavit of applicants for teacher certification. Therefore, Gonzaga is entitled to judgment on the contract claim as a matter of law, and we reverse the award for breach of contract.

Even if we did not reach this result, we would nonetheless strike the contract damages as duplicative. The jury was instructed to consider only economic injury in deciding how much compensation to award on the breach of contract claim. The only economic injury that John Doe alleged was

the injury to his career resulting from Gonzaga's release of his name to OSPI, and its decision not to sign the moral character affidavit. These injuries flowed directly from the allegedly defamatory communications. Therefore, the contract damages duplicate the defamation damages.

## EVIDENTIARY AND DISCOVERY ISSUES

### A. Work Product Documents

Gonzaga argues that the trial court abused its discretion in ordering it to disclose, and admitting into evidence, four documents that Gonzaga personnel prepared at the direction of corporate counsel. In his cross-appeal, John Doe argues that the court erred in refusing to impose sanctions on Gonzaga for its failure to produce one of those documents.

### 1. Discoverability

John Doe sought to discover four documents that certain Gonzaga employees had prepared in anticipation of litigation in this case. Of greatest concern here is a six-page chronology that Roberta League and Susan Kyle prepared, which listed relevant dates and the events that occurred on those dates. Gonzaga argued below that the chronology was not discoverable because it was protected by attorney-client privilege. The trial court disagreed, characterizing the document as work product. The court allowed discovery of the document, finding that John Doe had substantial need for it and could not obtain the information that it contained in any other way. Gonzaga argues again on appeal that the documents are privileged.

Documents prepared by a client or his or her attorney "in anticipation of litigation" are characterized as work product. CR 26(b)(4). Work product is not discoverable unless the party seeking discovery can show that he "has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." CR 26(b)(4). John Doe concedes that the four docu-

ments are work product. We cannot say that the trial court abused its discretion in determining the issues of "substantial need" or "undue hardship." We therefore affirm these rulings by the trial court.

Because John Doe now is familiar with the documents, and can obtain the information they contain by deposing the relevant witnesses, he cannot show substantial need for them on remand. Gonzaga is not required to produce them on remand, and the documents remain privileged and inadmissible.

## 2. Discovery Sanctions

In his cross-appeal, John Doe argues that the trial court should have imposed sanctions on Gonzaga for failing to produce the chronology in response to an interrogatory. We review sanctions decisions for abuse of discretion. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993). We hold that the trial court abused its discretion here.

Upon completion of early discovery in this case, John Doe pieced together an initial chronology of Gonzaga's internal meetings and communications regarding the sexual abuse allegations. John Doe then provided Gonzaga with this chronology, along with an interrogatory asking Gonzaga to identify any communications and meetings not reflected in the chronology. Gonzaga did not answer the interrogatory, claiming that it was "unduly burdensome [and] oppressive." Gonzaga assured John Doe that he already had all the information he needed to answer the interrogatory. Several years later, through an independent motion, John Doe's counsel finally received the chronology at issue. John Doe claims the chronology contained numerous references to meetings that Gonzaga had not previously disclosed, requiring him to re-depose two witnesses. John Doe filed a CR 26(g) motion for sanctions. The trial court found that John Doe had suffered no harm because he ultimately obtained possession of the chronology; the court therefore denied the motion for sanctions.

The relevant rule here is CR 26(g), which

requires an attorney to respond to a discovery request after making "reasonable inquiry," and to certify that the response is: (1) consistent with the rules, (2) not interposed for any improper purpose, and (3) not unreasonable or unduly burdensome or expensive. Whether an attorney has made a reasonable inquiry is to be judged by an objective standard. *Fisons*, 122 Wn.2d at 343. The purpose of CR 26(g) is to encourage a "spirit of cooperation and forthrightness during the discovery process." *Fisons*, 122 Wn.2d at 342. Sanctions are mandatory if the court finds that a party violated the rule. *Id.* at 346.

Here, the record reflects that Gonzaga responded to the interrogatory without making reasonable inquiry. Gonzaga's counsel could have responded to the interrogatory by asking his clients to provide a chronology of relevant events based on their own knowledge. After all, Roberta League had already prepared a chronology for Gonzaga. Gonzaga's response was also misleading. Relying on Gonzaga's assurances that he already had all the relevant information, John Doe did not move to compel a response. Gonzaga's response was inconsistent with the spirit and intent of the rules. The court therefore abused its discretion in failing to impose a sanction, and is ordered to impose an appropriate sanction on remand.

█ █ In determining an appropriate sanction, the trial court has wide latitude. *Id.* at 356. The court must impose the least severe sanction that will be adequate to serve its purposes, but the sanction should not be so minimal that it undermines those purposes. *Fisons*, 122 Wn.2d at 356. The purposes of sanctions are to deter, to punish, to compensate and to educate. *Id.*

## B. Settlement Agreement

Gonzaga next argues that the trial court abused its discretion in refusing to admit the settlement agreement between John Doe and Jane Doe. Gonzaga claims the settlement agreement is relevant in determining the credibility of Jane Doe's testimony. We agree.

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *State v. Lynch*, 58 Wn. App. 83, 792 P.2d 167 (1990).

According to ER 408, evidence of a settlement agreement is not admissible to prove whether a party is liable on a particular claim. But the rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness." ER 408. The purpose of the rule is to encourage parties to make whatever admissions may lead to a successful compromise without sacrificing portions of their case in the event these efforts fail. Comment ER 408.

Here, John Doe's and Jane Doe's settlement agreement and release provides that John Doe may resume his lawsuit against Jane Doe if any new evidence surfaces suggesting that Jane Doe has accused him of sexual assault. The agreement therefore is probative of the truth of Jane Doe's claims in her videotaped testimony that John Doe never assaulted her. Furthermore, Gonzaga did not offer the settlement agreement as a means of proving Jane Doe's liability; she was no longer a party to the lawsuit. ER 408 allows admission of a settlement agreement for Gonzaga's intended purpose—to prove Jane Doe's bias. Therefore, the trial court abused its discretion in excluding the settlement agreement. The court is instructed to admit evidence of the agreement on remand.

## C. Impeachment Evidence

Gonzaga argues that the trial court abused its discretion in refusing under ER 613 to allow Gonzaga to admit the testimony of two witnesses who were disclosed late into the trial. Gonzaga offered the testimony for the purposes of proving that Jane Doe had made prior statements inconsistent with her deposition testimony at trial. However, we need not reach this issue in light of our decision to remand the case.

## CONCLUSION

We reverse and remand for a new trial on the defamation

claim. On remand, the trial court must include a *Prins* jury instruction. The court must also define "reckless disregard" for the jury in a manner that makes clear the subjective nature of that standard. We reverse the negligence, invasion of privacy, 42 U.S.C. § 1983, and breach of contract judgments. On remand, Gonzaga need not produce the four work product documents. The settlement agreement between Jane Doe and John Doe, and the testimony of Ashlock and Green, are admissible.

Reversed and remanded.

AGID, A.C.J., and ELLINGTON, J., concur.

Review granted at 141 Wn.2d 1023 (2000).