[No. 25637-1-II. Division Two. February 2, 2001.]

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, *Respondent*, v. LORA OSBORN, *Appellant*.

*Gary Williams* (of *Williams Law Office*), for appellant.

*Jerret E. Sale* (of *Bullivant Houser Bailey*), for respondent.

SEINFELD, J. — Lora Osborn appeals the trial court's summary judgment dismissing her bad faith and Consumer Protection Act (CPA) claims against American Manufacturers Mutual Insurance Company (AMMI). She alleges that there are questions of fact as to whether the insurer acted

in bad faith and she requests sanctions against the insurer for citing a Court of Appeals case that the Supreme Court had reversed. We affirm.

## FACTS

On December 7, 1992, a fire damaged Osborn's residence. AMMI had issued an insurance policy that covered the loss. The policy provided that in the event the parties could not agree as to the amount of the loss, either party could petition for an appraisal.[1]

AMMI assigned adjuster Paul Brown to Osborn's claim. Brown contacted Osborn on the day of the fire and visited the residence the following day, at which time Osborn authorized Crystal Clean Care to begin cleaning and itemizing her personal property. Brown visited the residence again on December 9, and Osborn authorized Mt. Hood Cleaners to inspect, inventory, and clean the clothing that had been in the residence during the fire.

Brown also had Lay's Construction prepare a bid for building repairs. Lay's Construction estimated that the cost to repair the building would be $20,895.30, and Brown estimated that the repairs would take about 60 days. Brown and Osborn discussed the coverage of her additional living expenses during that 60-day period.

On December 17, Osborn retained the Kaye Company, a firm of public adjusters, to assist with her claim. Shortly thereafter, she instructed Crystal Clean Care to discontinue cleaning her personal property and refused to allow Lay's Construction to repair the residence.

In January 1993, Brown told Carol Portalski of the Kaye Company that AMMI would pay Osborn's additional living expenses for the previous month and for the time it took to complete the repairs if Osborn would immediately authorize repairs. A few days later, he sent a follow-up letter to Osborn with a proof of loss form enclosed. He asked her to

---

[1] In an appraisal, each party chooses an appraiser, the appraisers select an umpire, and the panel establishes the amount of loss under the policy.

complete and return the form within 60 days.

Six days later, Brown met with Osborn and a Kaye Company representative. Apparently at the direction of Roger Howson of the Kaye Company, Osborn refused to authorize the cleaning of the residence and instead insisted that the interior be completely gutted and replaced. She also refused to give Brown a statement, apparently on Howson's advice.

On February 1, 1993, Osborn contacted Brown and asked when the repairs would start. In response to Brown's explanation that she had refused to allow the repairs, Osborn again said that the house was ruined and that Brown's recommended repairs would not be adequate. Three days later, Howson wrote to Brown and informed him that Osborn had retained a new firm of public adjusters. Howson also confirmed that Osborn had requested an appraisal pursuant to the terms of the insurance contract.

In February, Brown again asked Osborn for authority to begin repairs but told her that AMMI would consider only "normal and recognized repair [and] restoration cleaning techniques." Clerk's Papers (CP) at 36. Brown reiterated that he had obtained a repair bid for $20,895.30 and that the repairs would take approximately 60 days.

Brown recommended that Osborn obtain her own bids if she was not satisfied with the bid from Lay's Construction. He stated that AMMI was willing to review such bids and any proposed procedures and come to a compromise. He also informed Osborn that any delay in cleaning and repairs might cause additional damage to her property and violate her obligation to protect her property and mitigate her loss.

Brown asked Osborn to respond to his letter and to allow the cleaning and repairs to start or face suspension of her coverage for additional living expenses and for additional damage caused by the delay. Osborn again refused to allow the repairs to proceed.

Brown contacted Osborn's new public adjuster, Wayne

Magnoni, on February 9. Magnoni had not yet received Osborn's file from the Kaye Company and did not have any bids or estimates to submit but he asserted that the repairs did not need to commence until after Osborn submitted her proof of loss form, which was not yet due. Magnoni requested that AMMI extend Osborn's additional living expense coverage until after Osborn submitted her proof of loss form and there was time for "reasonable repair." Magnoni said that if AMMI disputed any delay, they could resolve the issue in appraisal. Magnoni also informed Brown that he would be unavailable until February 21 and that he hoped to review the Kaye Company file when he returned.

Brown, Osborn, and Magnoni met on March 11, 1993, to review the damage to the residence. Osborn again objected to the bid Brown had obtained, asserting that the residence needed more than cleaning. But she still did not have a written estimate or repair bid; she merely informed Brown that her neighbor said he could perform the repairs for $60,000.

Osborn submitted her proof of loss form a week later. There was no supporting documentation for her figures but she stated that a "letter of explanation" would follow. Osborn indicated a $50,000 actual cash value (ACV) and $65,327.49 replacement cost value (RCV) loss on the building and over $100,000 ACV and RCV on her personal property.

Magnoni wrote to Brown on March 23, complaining that AMMI had not allowed Osborn additional time to complete the proof of loss form. Later that same week, Brown told Magnoni that AMMI was rejecting the proof of loss and, on April 14, Brown notified Osborn by letter that AMMI had rejected her proof of loss because there was insufficient documentation of the claimed amounts and because AMMI disagreed with those amounts. Brown agreed that there should be an appraisal to resolve the matter.

On April 20, Magnoni informed Brown by letter that Osborn would not agree to an appraisal because AMMI's

rejection of her proof of loss was four days late. Magnoni reasserted this position in letters dated May 4 and May 13, 1993.

In his April 20 letter, Magnoni apparently included a copy of a county record indicating that the residence had an assessed value of $166,000; a copy of a comparative market analysis indicating a market value of $165,000 to $172,000; and a copy of an offer from a local contractor to buy the property in its present condition for $110,000.[2] Magnoni stated that Osborn had independently obtained the building loss estimate she used on the proof of loss form from a contractor but did not supply a written estimate. Osborn had personally performed the majority of the personal property inventory and valuation; the Kaye Company, however, had provided some of the clothing prices without Osborn's review. Magnoni claimed that the time constraints that Brown imposed forced Osborn to submit evaluations performed in that manner.

AMMI decided to pursue the appraisal and, apparently because Osborn resisted the process, petitioned on July 15, 1993, for the appointment of an umpire. On July 30, Osborn's attorney requested a postponement of the hearing on this petition. Soon after filing the petition, AMMI issued checks to Osborn for the undisputed amounts of her losses.

On September 14, 1993, Osborn filed her answer to AMMI's petition in which she alleged that AMMI's untimely rejection of her proof of loss foreclosed its appraisal request. Osborn also filed numerous counterclaims that asserted bad faith and CPA violations. She claimed that AMMI had failed to properly (1) respond to her inquiries; (2) "adjust the claim when they knew liability was reasonably clear"; (3) investigate the claim and appraise the loss; (4) "adjust the claim pursuant to case law interpreting [the] policy; and/or" (5) "comply with the rules and regulations of the state of Washington's Insurance Commissioner as found in WAC 284.30.330 or other subparts applicable thereto."

---

[2] The documents referred to in the letter are not part of the appellate court record.

CP at 172. Osborn sought payment of the claim in her proof of loss, unspecified damages for "bad faith," and reasonable attorney fees.

Finally, on November 24, 1993, Osborn agreed to participate in appraisal proceedings but later she again changed her mind. AMMI then moved to compel appraisal. After Osborn twice postponed the hearing on the motion to compel, on February 9, 1994, the trial court granted the motion.

Brown, Osborn, and the appraisers then scheduled a meeting to inspect Osborn's property on April 18, 1994, but neither Osborn nor Magnoni appeared.[3] Magnoni apparently refused to allow AMMI's appraiser to view the property until June 7. In December 1994, the appraisers awarded $56,046.48 RCV, later adjusted to $63,548.56, and $49,320.90 ACV for the residence.

In December 1995, there were appraisal hearings to determine the value of the personal property and additional living expense claims. The parties agreed on a monthly living expense of $1,000 but disagreed on the number of months. AMMI had already paid Osborn $3,375 for approximately three months notwithstanding its assertion that the residence could have been repaired in 60 days. Osborn claimed she was entitled to coverage for 128 weeks, approximately $32,000. In May 1996, the appraisers awarded Osborn $6,329.42 additional living expenses.

At the appraisal on the personal property claim, AMMI offered $31,233.91 ACV and $36,384.66 RCV. Osborn requested $126,440.76 ACV and $142,701.19 RCV. The appraisers awarded her $47,310.99 ACV and $69,411.68 RCV. Osborn did not present her final claim for the RCV of her contents until February 1998.

AMMI moved for summary judgment on the bad faith and CPA claims in October 1999. In response, Osborn

---

[3] In her reply brief, Osborn states that this was a contested allegation, but she fails to show that there is any evidence in the record that contradicts Brown's assertion in his declaration; her cites to the record are incorrect.

asserted that the motion was frivolous and was based in part on reversed authority. She provided minimal argument, merely citing and quoting certain provisions of the Washington Administrative Code (WAC) that she claimed AMMI violated and citing generally to Brown's and her counsel's declarations.[4] She stated: "We don't argue those issues in detail here, as it is unnecessary[]" because AMMI failed to meet its burden of showing no issues of material fact. CP at 60.

The trial court granted summary judgment to AMMI. In doing so, the court observed that although the appraisal awards were greater than AMMI's offers, this fact alone was insufficient to defeat AMMI's summary judgment motion. The court noted that Osborn had failed to produce any evidence showing that the delays, which she claimed harmed her, were the result of AMMI's actions rather than her own or to produce other evidence supporting a cause of action for unreasonable investigation and claim adjustment. Finally, the trial court denied Osborn's request for sanctions or terms. Osborn appeals.

## ANALYSIS

Osborn contends that questions of fact exist as to whether AMMI, acting in bad faith, violated one or more insurance regulations. She argues that AMMI violated WAC 284-30--330(3), (4), (6), (7), and (18).

AMMI responds that Osborn has presented no evidence to show that (1) its initial offers were unreasonable in light of the surrounding circumstances, or (2) it unreasonably delayed the resolution of Osborn's claims. It also asserts that there is no evidence that it failed to adopt or implement proper claims handling procedures or that its investigation of Osborn's claim was deficient.

---

[4] Attached to her counsel's affidavit were (1) AMMI's first set of interrogatories and requests for production with Osborn's responses; (2) Osborn's completed proof of loss form; (3) copies of the appraisal awards; and (4) a letter from AMMI listing payments made on the claim. Osborn's interrogatory responses refer to materials in AMMI's claims file acquired in prior discovery and materials in Magnoni's file, but none of these items are in the appellate court record.

## A. Summary Judgment Standard

When reviewing a summary judgment, we engage in a de novo review. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 394, 823 P.2d 499 (1992); *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989); *Fischer-McReynolds v. Quasim*, 101 Wn. App. 801, 807, 6 P.3d 30 (2000). Summary judgment is appropriate if, viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party, (1) there is no genuine issue of material fact, (2) a reasonable person could reach but one conclusion, and (3) the moving party is entitled to judgment as a matter of law. *Safeco*, 118 Wn.2d at 394-95; *Young*, 112 Wn.2d at 226; *Fischer-McReynolds*, 101 Wn. App. at 806-07.

Whether an insurer acted in bad faith and whether an insurer's acts prejudiced the insured are questions of fact. *Safeco*, 118 Wn.2d at 395. As the moving party, AMMI has the initial burden of showing the absence of an issue of material fact as to these issues. *Safeco*, 118 Wn.2d at 395; *Young*, 112 Wn.2d at 225; *Fischer-McReynolds*, 101 Wn. App. at 808.

Osborn asserts that to meet this burden, AMMI had to negate her claims or prove that it did not violate the regulations or damage her. This is incorrect; AMMI could meet its burden by showing the absence of evidence to support Osborn's case. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991).

The burden then shifted to Osborn to set forth specific facts establishing that there was a genuine issue for trial. *Young*, 112 Wn.2d at 225; *Fischer-McReynolds*, 101 Wn. App. at 808. Osborn could not rely solely on the allegations in her pleadings, on speculation, or on argumentative assertions that unresolved factual issues remain. *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997); CR 56(c), (e).

## B. Good Faith and Consumer Protection Act Causes of Action

The fiduciary relationship between the insurer and the insured is the source of the duty of good faith. *Tank v.*

*State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385, 715 P.2d 1133 (1986). "[A]n insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests." *Tank*, 105 Wn.2d at 386 (emphasis omitted). The duty to act in good faith is broad and conduct that does not amount to intentional bad faith or fraud may be a breach of the duty. *Indus. Indem. Co. of the N.W. v Kallevig*, 114 Wn.2d 907, 916-17, 792 P.2d 520 (1990). This duty is both legislatively and judicially imposed. *See* RCW 48.01.030;[5] *Tank*, 105 Wn.2d at 386.

The Insurance Commissioner has promulgated regulations that define specific acts and practices that constitute a breach of an insurer's duty of good faith. RCW 48.30.010; *see* WAC 284-30-300 to -800; *Tank*, 105 Wn.2d at 386. Generally, "[a]n action for bad faith handling of an insurance claim sounds in tort." *Safeco*, 118 Wn.2d at 389; *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 333, 2 P.3d 1029 (2000). But a breach of these regulations also constitutes a per se unfair trade practice violation and "insureds may bring a private action against their insurers for breach of duty of good faith under the CPA" based on such breaches. *Tank*, 105 Wn.2d at 386, 394.

To prevail on a CPA claim, one must show (1) an unfair or deceptive act or practice in trade or commerce that impacts the public interest, and (2) resulting injury to the claimant's business or property. *Indus. Indem.*, 114 Wn.2d at 920-21; *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). The insured may establish the first element by showing a violation of any subsection of WAC 284-30-330. *See Indus. Indem.*, 114 Wn.2d at 923; *Hangman Ridge*, 105 Wn.2d at 786; *Anderson*, 101 Wn. App. at 330.

The elements of a non-CPA bad-faith claim are similar. The violation of a WAC 284-30-330 subsection establishes a

---

[5] RCW 48.01.030: "The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance."

breach of duty. *Anderson*, 101 Wn. App. at 333. But, unlike the injury in the CPA claim, the injury alleged need not be economic and may include emotional distress or personal injury. *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 284, 961 P.2d 933 (1998) (*Coventry* II).

Thus, to prevail on a summary judgment motion on either the CPA or non-CPA bad-faith claims, AMMI must show there is no question of fact as to (1) whether it violated any subsection of WAC 284-30-330, or (2) whether such violation caused a recognized injury. *Indus. Indem.*, 114 Wn.2d at 920-21; *Hangman Ridge*, 105 Wn.2d at 784-85.

1. WAC 284-30-330

 Osborn claims that AMMI violated WAC 284-30--330(3), which states that "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" is an unfair method of competition or unfair or deceptive act or practice. But Osborn failed to present evidence to support this claim. Her argument that AMMI "dribbled payments" to her over a long period of time is not evidence of AMMI's investigation standards. Because Osborn failed to present evidence to support this theory, the trial court properly dismissed this portion of Osborn's cause of action.

 Osborn next claims that AMMI violated WAC 284--30-330(4), which provides that "[r]efusing to pay claims without conducting a reasonable investigation" is an unfair method of competition or unfair or deceptive act or practice. Osborn argues that if AMMI had conducted a reasonable investigation, it would have offered a more appropriate settlement amount and an appraisal hearing would have been unnecessary. But, once again, she has failed to produce competent evidence that AMMI's investigation was not reasonable or that there was a basis for Brown to investigate the claim further. Thus, again, she has failed to show the existence of a question of material fact as to whether AMMI violated WAC 284-30-330(4).

Finally, Osborn asserts that AMMI violated WAC 284-30--330(6), (7), and (18). She alleges that AMMI's initial low offer was unreasonable and made in bad faith and that it forced her to participate in the appraisal process, which in turn delayed and increased the costs of a fair and equitable settlement and caused emotional distress.

WAC 284-30-330(6) provides that "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" is an unfair method of competition or unfair or deceptive act or practice. WAC 284-30-330(7) provides that "[c]ompelling insureds to institute or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings" is an unfair method of competition or unfair or deceptive act or practice. Similarly, WAC 284-30-330(18) provides that "[f]ailing to make a good faith effort to settle a claim before exercising a contract right to an appraisal" is an unfair method of competition or unfair or deceptive act or practice.

██ ██ Osborn contends that because WAC 284-30--330(7) does not contain a specific "reasonableness" requirement, the reasonableness of the insurer's conduct is not a defense. But RCW 19.86.920 imports the reasonableness standard into the CPA as a whole:

> It is, however, the intent of the legislature that *this act shall not be construed to prohibit acts or practices which are reasonable* in relation to the development and preservation of business or which are not injurious to the public interest, nor be construed to authorize those acts or practices which unreasonably restrain trade or are unreasonable per se.

(Emphasis added.) *See also Anderson*, 101 Wn. App. at 335 (holding that there is a reasonableness requirement in WAC 284-30-330(7)); *State v. Black*, 100 Wn.2d 793, 802-03, 676 P.2d 963 (1984) (holding that RCW 19.86.920 indicates the Legislature's recognition that the CPA does not prohibit reasonable acts or business practices); *Keller v.*

*Allstate Ins. Co.*, 81 Wn. App. 624, 915 P.2d 1140 (1996) (holding that a reasonableness requirement is implied in WAC 284-30-330(7)); *Starczewski v. Unigard Ins. Group*, 61 Wn. App. 267, 810 P.2d 58 (1991) (requiring a finding that the insurer had no reasonable justification for its conduct before finding a violation of WAC 284-30-330(7)).

Osborn also asserts that *Coventry* II modifies the holding in the cases that previously imposed a reasonableness requirement in this context. But she fails to explain how *Coventry* II alters this requirement. The *Coventry* II court did not address the reasonableness requirement because the insurer conceded its bad faith investigation for purpose of the appeal. 136 Wn.2d at 276. Thus, we conclude that there is an implied reasonableness requirement in WAC 284-30-330(7) and that to overcome AMMI's summary judgment motion, Osborn needed to establish the existence of a question of fact as to whether AMMI acted reasonably.

Osborn alternatively argues that if there is an implied reasonableness requirement in WAC 284-30-330(7), it should apply only in the context of uninsured motorist (UIM) claims, not in the first party context where, Osborn contends, the insurer owes the insured a higher duty of good faith. But Osborn's authorities do not support this conclusion. *See Indus. Indem.*, 114 Wn.2d at 916-17 (holding in a first party fire claim that an insurer's denial of coverage without reasonable justification constitutes bad faith); *Whistman v. W. Am.*, 38 Wn. App. 580, 585, 686 P.2d 1086 (1984) (holding in first party fire claim that "[a]ctions by an insurer done without reasonable justification are done without the good faith mandated by RCW 48.01.030 and are sufficient to constitute a violation of the [CPA]"); *Safeco Ins. Co. of Am. v. JMG Rests., Inc.*, 37 Wn. App. 1, 14, 680 P.2d 409 (1984) (holding in first party fire claim that insurer's denial of coverage must be unreasonable).

Here, Osborn attempted to rely solely on the discrepancy between the offered amount and the appraisers' award to demonstrate that AMMI's offer was unreasonable. We rejected this approach in *Keller*, explaining:

Adoption of a strict number comparison approach would make an insurer strictly liable for damages any time its pretrial evaluation of a claim turned out to be substantially less than the jury's verdict. It would not allow consideration of the reason for the disparity, or require a finding that the insurer's wrongdoing was a cause of the disparity.

81 Wn. App. at 633. Rather, the court must consider the circumstances and reasoning underlying the original offer. *Keller*, 81 Wn. App. at 633-34.

Division One of the Court of Appeals recently distinguished *Keller* and found that the disparity between an insurer's offer, $7,500, and the $100,000 policy limit settlement created a question of fact for the jury as to whether the insurer had violated WAC 284-30-330(7). *Anderson*, 101 Wn. App. at 335-36. The *Anderson* court noted that the *Keller* appeal followed a full trial whereas Anderson was appealing from a summary judgment in favor of State Farm. But this is not the only distinction between *Anderson* and *Keller* or between *Anderson* and this case.

In *Anderson*, the plaintiff/driver lost control of her car and hit a cement barrier. Her passenger said that she was driving carefully and that another car had swerved in front of her. But another witness and the driver of the swerving car described the event differently; they said that the plaintiff/driver had been speeding, tailgating, and attempting to pass on the shoulder. State Farm ignored the plaintiff/driver's witness and, based solely on the witnesses against her, determined "that she had no UIM claim because she was the sole cause of the accident." *Anderson*, 101 Wn. App. at 328.

Thus, in *Anderson*, unlike here, the record contained a description of the facts and circumstances surrounding the offer from which a jury could find that the insurer acted unreasonably. Here, the disparity between the offer and the subsequent arbitration award was the only evidence that the insured provided to support her allegation of an unreasonably low offer. That evidence alone provides no basis to evaluate the insurer's conduct. Thus, we conclude that *Anderson* is not analogous to the case before us and that

Osborn has failed to raise an issue of material fact to support her claim that AMMI violated WAC 284-30-330(6), (7), and (18).

2. Causation and Damages

Given Osborn's failure to submit evidence supporting her claims, we find no issues of material fact as to causation.

C. Citation to Reversed Authority

Below, AMMI relied on *Coventry Associates, L.P. v. American States Insurance Co.*, 86 Wn. App. 845, 939 P.2d 1245 (1997) (*Coventry* I). The Supreme Court reversed *Coventry* I before AMMI filed its summary judgment motion but AMMI did not provide the trial court with this subsequent history.

AMMI cited *Coventry* I for the proposition that a court will not presume harm in bad faith or CPA causes of action because of procedural errors or shortcomings of an investigation. *Coventry* II did not alter this holding.

But AMMI also appeared to rely on *Coventry* I to establish that an insured who ultimately fully recovers under an the insurance contract has not suffered harm. *Coventry* II substantially altered this aspect of *Coventry* I. In *Coventry* II, the Supreme Court specifically held that an insured who has received the full benefit under an insurance contract can still establish harm for the purposes of his or her bad faith or CPA claim because these claims are independent of recovery under the policy. 136 Wn.2d at 279.

Osborn asserts that the trial court erred when it denied her request for terms or sanctions against AMMI for relying on *Coventry* I and that AMMI violated the spirit of RPC 3.3 by failing to disclose controlling contrary authority to the tribunal.[6]

Osborn did not specifically assert a violation of RPC 3.3

---

[6] RPC 3.3(a)(3) states that a lawyer shall not knowingly "[f]ail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client *and not disclosed by opposing counsel*[.]" (Emphasis added.) As Osborn disclosed *Coventry* II in her response to AMMI's summary judgment motion, arguably AMMI did not violate RPC 3.3(a)(3).

below. Instead, she argued for dismissal of AMMI's summary judgment motion *as a whole*, contending that it lacked merit, was frivolous, and was based in part on overruled authority.

We need not address claims of error not raised in the trial court or arguments presented for the first time on appeal. RAP 2.5(a).[7] Further, we review a denial of a request for sanctions or terms under an abuse of discretion standard. Because the record contains no indication of why the trial court denied terms or sanctions, we cannot determine whether the trial court abused its discretion. *See Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993); *Doe v. Gonzaga Univ.*, 99 Wn. App. 338, 360, 992 P.2d 545, *review granted*, 141 Wn.2d 1023 (2000); *McClure v. Davis Wright Tremaine*, 77 Wn. App. 312, 317, 890 P.2d 466 (1995).

D. Attorney Fees

Osborn requests attorney fees under the CPA. Because she has not prevailed on appeal, she is not entitled to fees.

Accordingly, we affirm.

ARMSTRONG, C.J., and MORGAN, J., concur.

Review denied at 144 Wn.2d 1005 (2001).

---

[7] RAP 2.5(a) states in part: "The appellate court may refuse to review any claim of error which was not raised in the trial court."