**BERKSHIRE HATHAWAY HOMES-TATE INSURANCE CO., Plaintiff,**

v.

**SQI, INC., et al., Defendants.**

**Case No. C14–0868JLR.**

United States District Court,
W.D. Washington,
at Seattle.

Signed Sept. 21, 2015.

Gary A. Sparling, Soha & Lang PS, Seattle, WA, for Plaintiff.

Matthew Michael Kennedy, Morgan J. Wais, Richard Lawrence Martens, Martens Associates PS, Seattle, WA, for Defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JAMES L. ROBART, District Judge.

### I. INTRODUCTION

Before the court are (1) Plaintiff Berkshire Hathaway Homestate Insurance Company, formerly known as Cornhusker Casualty Company's ("Cornhusker"), motion for summary judgment (Corn. Mot. (Dkt. # 73)) and (2) Defendants and Counterclaimants SQI, Inc. ("SQI"), Ledcor Industries (USA), Inc. ("Ledcor") and Admiral Way, LLC's ("Admiral") motion for summary judgment (Def. Mot. (Dkt. # 70)). The court has considered the motions and the parties' submissions related to the motions, the balance of the record, and the relevant law. Being fully advised, the court DENIES Defendants' motion, GRANTS Cornhusker's motion, DECLARES that the insurance policies at issue provide no coverage to Defendants related to the underlying litigation, and DISMISSES Defendants' counterclaims.

### II. BACKGROUND

This is an insurance dispute arising out of underlying construction defect litigation. Cornhusker moves for summary judgment

that it has no obligation to indemnify its insured, SQI, with respect to the underlying litigation. (*See* Corn. Mot. at 17–19.) Cornhusker's motion also seeks dismissal of SQI's extra-contractual counterclaims (*see id.* at 19–21), Defendants' counterclaim for reformation (*see id.* at 2728), and Admiral's and Ledcor's counterclaims as putative additional insureds (*see id.* at 21–27). Defendants oppose Cornhusker's motion and, in their own motion, request that the court grant summary judgment in their favor on SQI's extra-contractual counterclaims. (*See* Def. Mot. at 2.)

The case has its origins in a construction project in West Seattle. In 2001, developer Admiral hired Ledcor as the general contractor to build the Admiral Way Project ("the Project"), a structure consisting of 65 residential units, two ground-floor commercial units, and an underground parking garage. (*See* Corn. Mot. at 6; 3/30/15 Order (Dkt. # 48) at 2; 1st Sparling Decl. (Dkt. # 30) ¶ 5, Ex. D ("Project CCRs") ¶ 3.1; *see also* 1st Martens Decl. (Dkt. # 33) ¶ 5, Ex. D ("Gartin Decl.") ¶¶ 2, 4.) Ledcor in turn hired multiple subcontractors. (*See* 1st Sparling Decl. ¶ 8, Ex. G ("Ledcor Compl.") ¶ 12; *see also* Gartin Decl. ¶ 4.) One of those subcontractors was SQI, which Ledcor hired to do the roofing on the Project. (Corn. Mot. at 6; Ledcor Compl. ¶¶ 12–13.) In addition to working on the original roofing, SQI also performed repairs on the roof in May and June of 2005. (*See* Corn. Mot. at 8; 1st Gardner Decl. (Dkt. # 32) ¶¶ 2–4, Exs. 1–3; 3d Gardner Decl. (Dkt. # 83) ¶¶ 2–4.)

SQI had three year-long commercial general liability ("CGL") insurance policies with Cornhusker stretching from May 2003 to May 2006. (*See* Corn. Mot. at 3; 1st Martens Decl. ¶¶ 2–4, Exs. A–C; 2d Sparling Decl. (Dkt. # 74) ¶¶ 2–4, Exs. A–C.) Only the third policy ("the Policy"), which applied from May 2005 to May 2006, is directly in issue.[1] (*See* 2d Sparling Decl. ¶ 4, Ex. C ("Policy").) The Policy provided "Bodily Injury and Property Damage Liability" coverage ("BI/PD Coverage"),[2] as well as several other categories of coverage not relevant here. (Policy at 4–14.)[3] In addition, SQI paid extra premiums for products-completed operations hazard ("PCOH"), which extended SQI's BI/PD Coverage to bodily injury and property damage arising out of SQI's completed work or product as opposed to its ongoing operations.[4] *See Goodwin v. Wright*, 100 Wash.App. 631, 6 P.3d 1, 4 (2000); (3/30/15 Order at 3–4 & n. 3, 15–19; 1st Martens Decl. ¶¶ 2–4, Exs. A–C.)

---

1. The court has already determined that no coverage exists under SQI's first two policies (*see* 3/30/15 Order at 25), and the parties have not pointed to any relevant differences between the first two policies and the third policy with respect to Defendants' counterclaims.

2. Under the Policy's BI/PD Coverage, Cornhusker agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Policy at 4.) Cornhusker agreed to pay for bodily injury and property damage, however, only if "(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place within the 'coverage territory,' and (2) The 'bodily injury' or 'property damage' occurs during the policy period." (*Id.*) Moreover, such coverage is subject to the exclusions included under part 2 of the BI/PD Coverage. (*Id.* at 4–9.)

3. When referencing specific pages of the Policy, the court will use the exhibit page number found in the lower right corner of the page rather than the blue CM/ECF page number or the page number for the original document.

4. SQI's policies define PCOH as "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work,' " with a series of limitations. (Policy at 21.)

Multiple exclusions and limitations constrict the Policy's BI/PD Coverage. In particular, the Policy contains endorsements that add exclusions for residential construction [5] (Policy at 24), and "injury or damage in progress" [6] (*id.* at 25). Likewise, The Policy excludes property damage to "your work." [7] (*Id.* at 7.) The Policy also limits covered property damage to that which occurs during the policy period. (*Id.* at 4.) None of these exclusions and limitations mentions any exception for PCOH.

Litigation related to the Project commenced in 2007, when the Admiral Way Condominium Owners Association ("ACOA") sued Admiral in King County Superior Court alleging defects in the construction of the Project and Admiral added Ledcor as a third-party defendant ("the ACOA Suit"). (*See* Corn. Mot. at 13; 1st Sparling Decl. ¶ 6, Ex. E ("ACOA Compl."); Admiral Ans. (Dkt. # 17) ¶¶ 3.5–3.6.) While the ACOA Suit was ongoing, Admiral and Ledcor sued SQI and various other subcontractors, also in state court ("the Contractor Suit"). (*See* Corn. Mot. at 13; Ledcor Compl.) In 2010, separate coverage-related litigation began between several insurance companies and Admiral and Ledcor ("the Coverage Suit"). (*See* Corn. Mot. at 14.)

The parties provide scant information regarding the property damage at issue in these lawsuits. One of the few documents in the record relating to problems with the Project is a "list of known construction defects" that ACOA created in 2007 for its suit against Admiral. (*See* 2d Martens Decl. (Dkt. # 72) ¶ 2, Ex. 4 ("Ledcor Tender") at 7–12 ("ACOA Defect List") (also discussed in 2d Sparling Decl. ¶ 13, Ex. L ("Colvard Report") at 7–8).) This document lists the following alleged defects in the construction of the roof at the Project: (1) the roof membrane has several areas that lack adhesion and have blisters; (2) lead flashings used to weatherproof vent stacks are poorly detailed and prone to water intrusions; (3) galvanized metal flashings are poorly detailed and are prone to water intrusion; (4) metal caps lack saddle flashings at transitions with above-roof vertical walls; (5) two large areas on the roof have evidence of water trapped between the roofing plies; and (6) several smaller areas have evidence of lack of adhesion between the roofing plies.

---

**5.** The residential construction exclusion reads, in pertinent part, as follows: "This insurance does not apply to 'bodily injury' or 'property damage' resulting from or arising out of the original construction, in whole or in part, of condominiums.... This exclusion does not apply to the remodeling or repair of any existing structure...." (Policy at 24.) The residential construction exclusion is to be added to the exclusions under BI/PD Coverage. (*Id.*) Unlike the 2005–06 version of the residential construction exclusion, the previous two versions contain no language limiting the exclusion to "original construction" as opposed to "the remodeling or repair of any existing structure." (*See* 3/30/15 Order at 4 n. 5, 20.)

**6.** This exclusion provides, "This insurance does not apply to ... 'Bodily injury' or 'property damage' that begins, takes place, or oc-

curs prior to the inception date of this policy of insurance.... All 'property damage' to units of or within a single project or development, ... resulting from or arising out of substantially the same harm or conditions shall be deemed to have occurred at the earliest time of such 'property damage' to any unit of or within the project or development,...." (Policy at 25.) As with the residential construction exclusion, the "injury or damage in progress" exclusion is to be added to the exclusions under BI/PD Coverage. (*Id.*)

**7.** Specifically, The Policy excludes " 'Property damage' to 'your work' arising out of it or any part of it and included in the [PCOH].' " (Policy at 7.) The Policy defines "your work" as "Work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." (*Id.* at 22.)

(ACOA Defect List at 2–3.) The list does not explain, however, what property damage, if any, arose out of those construction defects. In fact, the court has been unable to locate any admissible evidence on that subject.[8]

Cornhusker learned of the claims against its insured when it received a tender from Ledcor on October 29, 2007, asserting Ledcor's status as an additional insured and requesting coverage in the ACOA Suit. (*See* Def. Mot. at 3; 2d Martens Decl. ¶ 2, Ex. 3 ("Claim Notes") at 1; Ledcor Tender at 1, 6.) Cornhusker began investigating this claim within 24 hours by sending John Colvard of Washington Oregon Claim Service to examine the roof and prepare a report. (*See* Claim Notes at 1; *see also* Colvard Report (dated 11/19/07).) Cornhusker's claim notes show that Cornhusker knew on October 30, 2007, that SQI had performed both the original construction of the Project's roof and the 2005 repair work on the roof. (*See* Claim Notes at 1.) On December 10, 2007, Cornhusker sent SQI a reservation-of-rights letter. (*See* 2d Martens Decl. ¶ 2, Ex. 2 ("RoR").) Cornhusker's letter informed SQI that Cornhusker would defend SQI in the underlying dispute but that coverage might not exist under the policies due to, among other policy provisions, the "your work" and residential construction exclusions. (*See id.* at 1, 9–12.) Cornhusker's letter quoted the entire 2005–06 residential construction exclusion, including its full title; however, the letter did not specifically discuss the language in the exclusion related to coverage for repairs, but rather stated only that the "Residential Construction Exclusions specifically exclude coverage for residential condominiums." (*Id.* at 11–12.)

Multiple mediations took place regarding the Contractor Suit. First, in April 2008, before Ledcor filed suit against SQI, Cornhusker received an invitation from Ledcor to a mediation in May. (*See* 2d Martens Decl. ¶ 2, Ex. 6 ("4/08 Ledcor Letter"); Claim Notes at 6.) Cornhusker had retained R. Scott "Bud" Fallon and the firm of Fallon & McKinley as counsel to represent SQI against Ledcor's claims. (*See* Corn. Mot. at 13; Corn. Resp. (Dkt. # 84) at 5; 2d Martens Decl. ¶ 2, Ex. 9; Messineo Decl. (Dkt. # 85) ¶¶ 5–6, Ex. A.) Mr. Fallon represented SQI at the May 2008 mediation but apparently without prior settlement authority from Cornhusker. (*See* 2d Martens Decl. ¶ 2, Ex. 7; Def. Mot. at 12.) In an internal email sent prior to the May 2008 mediation, Cornhusker employee Tom Dashel stated that the mediation "[s]ounds like ... [a] waste of time.... If there is no involvement of the of the [sic] HOA, this is meaningless." (2d Martens Decl. ¶ 2, Ex. 9.)

Two more mediations appear to have taken place in 2009 and another occurred in October 2010, all of which defense counsel attended—again, apparently without prior settlement authority from Cornhusker. (*See* 2d Martens Decl. ¶ 2, Ex. 7, Ex. 11.) After the 2010 mediation, Mr. Fallon wrote to Mr. Dashel explaining, "I checked into the mediation on June 8, several times, but the mediator and the parties were never ready to deal with the claims against SQI. I briefly explained our posi-

---

8. Cornhusker has offered the deposition testimony of several experts who participated in the underlying litigation, but Cornhusker apparently has not produced expert reports for those individuals in this litigation. (*See, e.g.,* Corn. Mot. at 6–7, 10–13.) Defendants argue that this evidence is therefore inadmissible. (*See* Def. Resp. (Dkt. # 82) at 8 n. 1 (citing Fed.R.Civ.P. 37(c)(1)).) Cornhusker responds that the testimony in question is factual, not opinion, testimony and is therefore admissible. (*See* Corn. Reply (Dkt. # 88) at 3 n. 4.) The court disagrees and does not consider the former expert testimony in deciding this motion.

tion to the mediator ... that the plaintiff's demand to us, based on 'practical assumptions,' was simply a percentage of the overall top of the building repair costs and was a non-starter for us in terms of real settlement discussion." (Messineo Decl. ¶ 9, Ex. D ("6/9/10 Fallon Letter"); *see also id.* ¶ 10, Ex. E.) [9] Mr. Dashel responded: "Payment of anything is a non starter [sic] for us ... Keep me posted Bud." (2d Martens Decl. ¶ 2, Ex. 12.) The parties point to no other information regarding what occurred at these mediations.[10]

A final mediation took place in March 2014. By this point, Admiral and Ledcor had settled the ACOA Suit (*see* Admiral Ans. ¶ 3.11 (noting that the ACOA suit settled in July 2009)), and Cornhusker had obtained a summary judgment ruling in the Coverage Suit that Ledcor was not an additional insured under SQI's policies with Cornhusker (*see* 1st Sparling Decl. ¶¶ 12–13, Exs. K–L). During the March 2014 mediation, Cornhusker's coverage

counsel, D. Bradley Hudson, attempted to negotiate a settlement that would include a $71,786.00 contribution from Cornhusker, a similar contribution from another insurer, and a release of SQI from further liability. (*See* 2d Gardner Decl. (Dkt. # 71) ¶¶ 3–4, Ex. A ("Hudson Letter") at 1; Hudson Decl.[11] (Dkt. # 86) ¶¶ 6–14.) Ledcor did not respond to that settlement offer. (*See* Hudson Letter at 1; Hudson Decl. ¶ 11.) Cornhusker's counsel also informed the mediator that if SQI agreed to have a judgment entered against it, Cornhusker would agree to pay $71,786.00, provided Ledcor gave Cornhusker a full release. (Hudson Letter at 1.)

The parties dispute how Cornhusker arrived at the $71,786.00 figure. Defendants argue that $71,786.00 represents Cornhusker's estimate of the low end of SQI's exposure, and that Cornhusker estimated that SQI might be liable for as much as $937,717.00. (*See* Def. Mot. at 14.) In support of this position, Defendants point

9. A letter from Mr. Fallon to Mr. Dashel before the 2010 mediation indicates that SQI had not been afforded time to participate in prior mediations as well. (*See* Messineo Decl. ¶ 7, Ex. B ("4/12/10 Fallon Letter") at 1 ("The parties are now talking about scheduling a mediation. They are ... talking about the dates of June 7–8, 2010. It is my recommendation that we participate in the mediation. I do first want to get a commitment from the new plaintiffs' counsel that they will actually deal with the subcontractors this time.").)

10. Defendants point to evidence in the record indicating that Cornhusker received a settlement demand prior to one of the 2009 mediations. (*See* Def. Mot. at 13 (citing 2d Martens Decl. ¶ 2, Ex. 10 ("6/10/09 Ledcor Letter")).) Defendants then state, "There is no notation in the Claims Notes that Cornhusker communicated this settlement offer to SQI. This is a further violation of Cornhusker's enhanced obligation of fair dealing to its insured, ...." (Def. Mot. at 13 (internal citation and footnote omitted).) The problem with this argument is that Ledcor addressed its settlement demand not just to Cornhusker but also to Mr. Fallon, SQI's defense counsel. (6/10/09

Ledcor Letter at 1.) Defendants bring no claim against Mr. Fallon, nor do they suggest at any point that Mr. Fallon failed to communicate settlement offers to SQI or otherwise violated any obligation to SQI. As such, the court disregards Defendants' suggestion that Cornhusker withheld settlement offers from SQI.

11. Defendants argue that Ms. Messineo's and Mr. Hudson's declarations are inadmissible because Cornhusker did not identify these individuals during its initial disclosures. (Def. Reply (Dkt. # 87) at 5.) The record reveals, however, that Cornhusker identified both Ms. Messineo and Mr. Hudson in its response to SQI's first set of interrogatories (*see* Dkt. # 64 at 14–15), and that Defendants identified Ms. Messineo as a potential witness in their initial disclosures (*see* Dkt. # 76–1 at 4). As such, the court finds that Defendants have not suffered prejudice from Cornhusker's failure to identify these witnesses in its initial disclosures, and therefore Ms. Messineo's and Mr. Hudson's declarations are admissible.

to two documents in the claims file, both of which appear to be detailed calculations of the values at stake in the Contractor Suit. (2d Martens Decl. ¶ 2, Exs. 13 (listing $71,786.00 as the final number),14 (listing $937,717.00 as the final number).) Cornhusker responds that the $937,717.00 figure comes from a preliminary draft and does not represent Cornhusker's estimate of SQI's exposure, and that the $71,786.00 figure constitutes Cornhusker's estimate of the covered amount of SQI's liability. (See Corn. Resp. at 7–8; Messineo Decl. ¶¶ 11–17, Exs. F–G.) Neither of the relevant documents makes clear on its face what exactly it represents.

Following the failed March 2014 mediation, Mr. Hudson sent a letter to Devon Thurtle Anderson, SQI's recently retained personal counsel. (See Hudson Letter; 2d Gardner Decl. ¶ 2; Def. Reply at 3–4.) Mr. Hudson informed Ms. Anderson of what he had done at the mediation. (Hudson Letter at 1.) He also reiterated that Cornhusker did not believe its policies provided coverage for the losses at issue in the Contractor Suit primarily due to the residential construction and "your work" exclusions.[12] (See id. at 14.) Nevertheless, Cornhusker's counsel assured Ms. Anderson that Cornhusker intended to continue to defend SQI and did not intend to initiate a lawsuit against SQI to determine coverage. (Id. at 4.) He also stated his belief that Ledcor and Admiral's claims against SQI far exceeded SQI's actual exposure. (Id.)[13]

In April 2014, SQI settled with Ledcor and Admiral. (See 2d Martens Decl. ¶ 2, Ex. 16 ("Stip. Judgment").) Acting through Ms. Anderson, SQI agreed to a consent judgment in the amount of $747,785.00 and assigned its rights against Cornhusker to Ledcor and Admiral in exchange for a covenant not to execute. (See Stip. Judgment; 1st Sparling Decl. ¶ 11, Ex. J ("IFCA Notice").) Defendants' settlement signaled the beginning of this action. Not only did SQI assign its rights against Cornhusker and obtain a covenant not to execute, but Defendants gave notice to Cornhusker of their intent to file claims against Cornhusker under Washington's Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015. (See id.) Anticipating impending litigation against Admiral and Ledcor as SQI's assignees, Cornhusker filed this action in federal court seeking a declaration that its policies do not provide coverage for the losses involved in the Contractor Suit. (See Compl. (Dkt. # 1).)

SQI, Admiral, and Ledcor have each filed an answer and made multiple counterclaims against Cornhusker. SQI's answer asserts counterclaims for breach of contract (duty to indemnify), bad faith, violation of Washington's Consumer Protection Act ("CPA"), RCW 19.86.010 et seq., and violation of IFCA. (See SQI Ans. (Dkt. # 16) ¶ 4.) Admiral's answer contains counterclaims for breach of contract (duty to indemnify Admiral as an additional insured) and violation of the CPA. (See Admiral Ans. ¶ 4.) Ledcor's answer alleges breach of contract (duty to defend and indemnify Ledcor as an additional insured), bad faith, and violation of the CPA. (See Ledcor Ans. (Dkt. # 18) ¶ 4.) All three Defendants assert a counterclaim for ref-

---

12. In quoting the residential construction exclusion, the letter included the language regarding "original construction" but left out the language pertaining to "repairs." (Hudson Letter at 2.)

13. Defendants attempt to characterize Mr. Hudon's letter to Ms. Anderson as threatening "SQI with a revocation of coverage for entering into a covenant judgment." (Def. Mot. at 15 & n. 12; Def. Reply at 9–10; 2d Gardner Decl. ¶¶ 3–4.) The court has carefully examined Mr. Hudson's letter and finds that it cannot be reasonably interpreted in the manner Defendants suggest.

ormation. (*Id.* ¶ 5.1; Admiral Ans. ¶ 5.1; SQI Ans. ¶ 5.1.)

The court has already addressed coverage issues once in this case. On November 13, 2014, Cornhusker filed a motion for summary judgment attempting to establish that Cornhusker has no duty to indemnify SQI or its assignees because the residential construction exclusion bars coverage in all of SQI's policies with Cornhusker. (*See* MSJ (Dkt. # 29).) Defendants resisted that motion on multiple grounds, including that the PCOH constitutes separate coverage to which the residential construction exclusion does not apply. (*See* MSJ Resp. at 10.) The court granted Cornhusker's motion in part and denied it in part. (*See* 3/30/15 Order.) Specifically, the court held that (1) PCOH falls within the policies' BI/PD Coverage and is subject to that coverage's exclusions and limitations; (2) the residential construction exclusions in the first two policies preclude coverage under those policies; (3) the third version of the residential construction exclusion places the burden on Cornhusker to show that any otherwise covered property damage occurring between May 2005 and May 2006 arose out of "original construction"; and (4) a genuine dispute of fact remained regarding the applicability of that version of the residential construction exclusion. (*See id.* at 15–26.)

On July 23, 2015, the parties filed the instant motions for summary judgment. (*See* Corn. Mot.; Def. Mot.) Cornhusker's motion seeks dismissal of Defendants' contractual and extra-contractual counterclaims and a declaration that its policies provide no coverage for the losses at issue in the Contractor Suit. (*See* Corn. Mot. at 1–2.) Defendants oppose Cornhusker's motion and bring their own motion in which they ask the court to grant summary judgment in their favor on SQI's assigned extra-contractual claims for bad faith, violation of the CPA, and violation of

IFCA. (*See* Def. Resp; Def. Mot. at 2.) The parties' cross-motions for summary judgment are now before the court.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Galen v. Cty. of L.A.,* 477 F.3d 652, 658 (9th Cir.2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets his or her burden, then the nonmoving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen,* 477 F.3d at 658. A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is " 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar,* 247 F.3d 986, 992 (9th Cir.2001) (citing *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505).

In determining whether the fact-finder could reasonably find in the nonmoving party's favor, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct.

2097, 147 L.Ed.2d 105 (2000). Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The court may only consider admissible evidence when ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773–75 (9th Cir.2002). "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682 F.2d 814, 819–20 (9th Cir.1982); see also *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir.2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

## B. Cornhusker's Motion

The court begins with Cornhusker's motion. As noted above, Cornhusker's motion seeks dismissal of Defendants' contractual and extra-contractual counterclaims, dismissal of Defendants' counterclaims for reformation, and a declaration that the Policy provides no coverage for the losses at issue in the Contractor Suit. (*See* Corn. Mot. at 12.) In support of its motion, Cornhusker makes the following arguments: (1) SQI cannot independently assert any claims against Cornhusker because SQI has assigned all such claims to Admiral and Ledcor (*see* Corn. Mot. at 16); (2) the Policy provides no coverage for the consent judgment in the Contrac-

tor Suit because Defendants can offer no evidence of any property damage that occurred within the policy period and that does not also fall within the residential construction, your work, or injury or damage in progress exclusions (*see id.* at 9, 17–19); (3) Defendants cannot show that Cornhusker acted in bad faith (*see id.* at 19–20), (4) violated the CPA (*see id.* at 21), or (5) violated IFCA (*see id.* at 20–21); (6) Admiral's and Ledcor's extra-contractual counterclaims are time barred (*see id.* at 26–27); and (7) Defendants' have no evidence to support their reformation claims (*see id.* at 27–28).[14] The court addresses each argument in turn.

### 1. SQI's Assigned Claims

Pursuant to Defendants' settlement agreement, SQI assigned "any and all of its rights and claims against ... Cornhusker ... relating to the Project[.]" (Stip. Judgment at 5.) SQI has since filed an answer in this lawsuit in which it asserts counterclaims for breach of contract (duty to indemnify), bad faith, violation of the CPA, and violation of IFCA. (*See* SQI Ans. ¶ 4.) Cornhusker attacks those counterclaims on the bases that SQI cannot independently assert any counterclaims against it and, insofar as Ledcor and Admiral assert counterclaims as SQI's assignees, Defendants lack evidence to support their counterclaims.

#### a. As an individual party, SQI has no remaining claims against Cornhusker

Defendants concede that following the assignment of its rights SQI cannot independently assert any claims against Cornhusker. (Def. Resp. at 6.) Only Admiral and Ledcor, as SQI's assignees, can now assert the contractual and extra-contractu-

14. Cornhusker makes several additional arguments not listed here (*see* Corn. Mot. at 2); however, the court need not reach such argu-

ments to dispose of Cornhusker's and Defendants' motions.

al claims that SQI previously held. (*See id.;* Stip. Judgment.) The court therefore dismisses whatever counterclaims SQI may have been attempting to assert as an individual party.

### b. Cornhusker did not breach its duty to indemnify SQI

Cornhusker next argues that the Policy provides no coverage related to the Project because Defendants can offer no evidence of any property damage that occurred within the policy period and that does not also fall within the residential construction, your work, or injury or damage in progress exclusions. (*See* Corn. Mot. at 9, 17–19.) The court agrees.

The interpretation of an insurance policy is a question of law for the court. *Overton v. Consolidated Ins. Co.,* 145 Wash.2d 417, 38 P.3d 322, 325 (2002). Insurance policies are contracts, which are construed as a whole with the terms interpreted as they would be understood by an average person purchasing insurance. *Id.* If the language of an insurance policy is clear and unambiguous, the court must enforce it as written and may not create ambiguity where none exists. *Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.,* 134 Wash.2d 413, 951 P.2d 250, 256 (1998).

The determination of whether coverage exists involves a burden-shifting framework. *See McDonald v. State Farm Fire & Cas. Co.,* 119 Wash.2d 724, 837 P.2d 1000, 1003–04 (1992). The insured bears the initial burden to demonstrate that the loss falls within the scope of the policy's insured losses. *See id.* If the insured makes that demonstration, the insurer can avoid coverage by showing that specific policy language excludes the loss. *See id.* at 1004. Exclusions from coverage are strictly construed against the insurer because they are contrary to the protective purpose of insurance. *Stuart v. Am.*

*States Ins. Co.,* 134 Wash.2d 814, 953 P.2d 462, 464 (1998).

As discussed above, the Policy covers property damage that occurs during the policy period—from May 2005 to May 2006. (Policy at 4.) Even where such property damage occurs, however, the Policy excludes from coverage property damage that arises out of the "original construction" of a condominium (*id.* at 24), as well as property damage to the insured's own work (*id.* at 7; *see also id.* at 22). The court's prior summary judgment order establishes that these exclusions and limitations apply to the Policy's PCOH provisions. (*See* 3/30/15 Order at 15–19.)

Defendants offer only the following evidence to support their assertion that covered property damage occurred during the policy period. First, Mark Gardner, the Vice President of SQI, attests that at the time SQI completed its repair work in June 2005 both the roof of the Project and all its surrounding structures were free from property damage that could have resulted from the original construction of the roof. (3d Gardner Decl. ¶¶ 4–5.) Second, Defendants point to the report that Cornhusker asked John Colvard to prepare after Cornhusker received Ledcor's tender. (*See* Colvard Report (cited by Def. Resp. at 2, 9).) That report references several roof-related construction defects, including water trapped between roofing plies. (*See* Colvard Report at 7–8.) From this evidence, Defendants' reason that SQI's repair work must have been defective, and [g]iven the known defects of SQI's repair work, it is virtually certain that water would have penetrated the roof membrane and started causing property damage the first time it rained following the completion of the repair work." (Def. Resp. at 10.) Defendants then observe that June 2005 was a rainy month and conclude that "the 'occurrence' triggering coverage under the 2005–2006 policy was likely imme-

diately after the completion of the May 2005 repairs." (*Id.*)

■ Defendants fall short of avoiding summary judgment. Even viewing the above evidence in the light most favorable to Defendants and indulging Defendants' rather large inferential leaps, *see Reeves*, 530 U.S. at 150, 120 S.Ct. 2097, a factfinder could conclude at most that SQI defectively repaired the roof thereby leading to the problems described in Mr. Colvard's report (*see* Colvard Report at 7–8). Those problems, however, are defects with the roof itself—the part of the Project that SQI installed and repaired. (*See id.;* Ledcor Compl. ¶¶ 12–13; 1st Gardner Decl. ¶¶ 2–4; 3d Gardner Decl. ¶¶ 2–4; 2d Sparling Decl. ¶¶ 5, 11, Exs. D, J.) Thus, even if those problems constitute property damage, such property damage is, as Cornhusker points out, damage to SQI's own work and therefore not covered pursuant to the "your work" exclusion. (*See* Corn. Mot. at 17–10 & n. 9; Policy at 7, 22.) Defendants point to no evidence of property damage to anything other than the roof that occurred between May 2005 and May 2006.[15] Accordingly, the court grants Cornhusker's motion on the issue of coverage.

Defendants attempt to forestall this result by arguing that coverage nevertheless exists under the PCOH provisions because the property damage to the roof occurred after SQI finished its work on the roof. (*See* Def. Resp. at 10–13.) To reach this conclusion, Defendants repeat an argument they made in response to Cornhusker's previous motion for summary judgment—namely, that the PCOH constitutes separate coverage to which the exclusions and limitations under the Policy's BI/PD Coverage do not apply. (*See id.* at 11–13.) The court analyzed and rejected that argument in its order on Cornhusker's prior motion. (*See* 3/30/15 Order at 15–19.) Defendants offer no reason to reconsider that ruling and in fact fail to acknowledge that they are repeating a previously rejected argument. (*See* Def. Mot. at 10–13.) The court stands on its prior decision and therefore concludes that the "your work" exclusion applies to the PCOH provisions.[16] As such, the court concludes that

---

15. Defendants cite to another portion of Mr. Colvard's report, claiming that it offers further evidence of water intrusion and property damage. (*See* Def. Resp. at 2 (citing Colvard Report at 2.)) Yet the cited portion describes an incident in which the source of the water damage was determined to be a plumbing issue, not the roof. (*See* Colvard Report at 2.) In addition, the court observes that at one point in his report Mr. Colvard describes the contents of a different report that ACOA's experts prepared. (*See* Colvard Report at 7–8.) To the extent Mr. Colvard confirms the findings of the ACOA report with his own observations, the court considers Mr. Colvard's statements. To the extent Mr. Colvard merely relays what the ACOA report says, Mr. Colvard's description is inadmissible hearsay. *See* Fed.R.Evid. 801(c), 802. Defendants have not included the ACOA experts' report in their summary judgment submissions, and in fact have successfully objected to Cornhusker's citation to the deposition testimony of one of the ACOA experts. (*See* Def. Resp. at 8 n. 1); *supra* note 8.

16. The court also rejects Defendants related contention that the PCOH provides coverage for property damage that occurs after the policy period provided such damage arises out of work performed within the policy period. (*See* Def. Mot. at 11–12.) The Policy contains no support for this contention. The PCOH covers "property damage" (Policy at 21), and the Policy applies to property damage only if it "occurs during the policy period" (*id.* at 4). Nothing in the PCOH suggest that its coverage is triggered by the timing of the work in question rather than the damage in question. (*Id.* at 21.) Nor does such an interpretation render the PCOH coverage illusory, as Defendants suggest. (*See* Def. Mot. at 12.) Defendants acknowledge that over 11 months of the policy period remained after SQI completed its 2005 repairs. (*Id.* at 7.) Any property damage occurring during those

the Policy provides no coverage for any losses related to the Project.

### c. *Cornhusker did not act in bad faith with respect to SQI*

In Washington, bad faith handling of an insurance claim is a tort and is analyzed under general tort principles: duty, breach of that duty, and damages proximately caused by the breach. *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr. Co.*, 161 Wash.2d 903, 169 P.3d 1, 8 (2007). To establish bad faith, an insured is required to show that the breach was unreasonable, frivolous, or unfounded. *Kirk v. Mt. Airy Ins. Co.*, 134 Wash.2d 558, 951 P.2d 1124, 1126 (1998). Ordinarily, whether an insurer acts in bad faith is a question of fact for the jury, unless reasonable minds could reach but one conclusion. *See Smith v. Safeco Ins. Co.*, 150 Wash.2d 478, 78 P.3d 1274, 1277 (2003). Context is critical to determining whether an insurer committed bad faith. *See Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wash.App. 686, 17 P.3d 1229, 1236 (2001); *Keller v. Allstate Ins. Co.*, 81 Wash.App. 624, 915 P.2d 1140, 1145 (1996) ("To determine whether [an insurer] acted reasonably, fairly, or deceptively, it is necessary to consider the circumstances surrounding the allegedly improper act.").

Furthermore, the duty of good faith "is broad and all-encompassing, and is not limited to an insurer's duty to pay, settle, or defend." *St. Paul Fire and Marine Ins. v. Onvia, Inc.*, 165 Wash.2d 122, 196 P.3d 664, 669 (2008). Thus, even where there would be no coverage or right to a defense under the policy terms, if an insurer mishandles a claim in bad faith, a cause of action based on this conduct remains viable. *Id.* at 668.

An insurer has an enhanced obligation to its insured when the insurer is defending under a reservation of rights.

*Safeco Ins. Co. v. Butler*, 118 Wash.2d 383, 823 P.2d 499, 503 (1992) (citing *Tank v. State Farm Fire & Cas. Co.*, 105 Wash.2d 381, 715 P.2d 1133, 1137 (1986)). The insurer can discharge this obligation by satisfying four criteria:

First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the *insured* is the client. Third, the company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of *all* developments relevant to his policy coverage and the progress of his lawsuit.... Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

*Tank*, 715 P.2d at 1137. If an insured establishes that its insurer acted in bad faith while defending under a reservation of rights, a rebuttable presumption of harm arises. *Butler*, 823 P.2d at 504–05. If the insurer fails to rebut that presumption and the insured prevails on the bad faith claim, the insurer is estopped from denying coverage. *Id.* at 505–06.

Defendants argue that Cornhusker acted in bad faith in six respects: by (1) misrepresenting pertinent policy provisions; (2) failing to engage in settlement negotiations in good faith; (3) failing to conduct a reasonably prompt investigation; (4) failing to render a decision on coverage within a reasonable period of time; (5) improperly comingling its files related to coverage and claims; and (6) unreasonably failing to share its claims file with Defen-

11 months might have come under the coverage of the PCOH provisions.

dants during discovery in this case. (*See* Def. Mot. at 2–3, 10–15, 23–25.) The court addresses each of these arguments in turn.

### i. Misrepresentation of policy provisions

Pursuant to WAC 284–30–330(1), an insurer's misrepresentation of pertinent facts or insurance policy provisions during the settlement of claims constitutes an unfair method of competition or deceptive act or practice in the business of insurance. WAC 284–30–330(1). Defendants contend that Cornhusker misrepresented pertinent policy provisions on two occasions. (*See* Def. Mot. at 11–12.) First, Defendants point to Cornhusker's reservation of rights letter, in which Cornhusker failed to specifically discuss the so-called "repairs exception" to the Policy's residential construction exclusion and instead quoted the entire exclusion, including the "repairs exception," and then stated that "[t]he Residential Construction Exclusions specifically exclude coverage for residential condominiums." (*Id.* at 11; RoR at 11–12.) Second, Defendants rely on Mr. Hudson's letter to SQI's personal counsel, wherein Mr. Hudson quoted the residential construction exclusion but omitted the language regarding repairs. (Def. Mot. at 11–12; Hudson Letter at 2.) Defendants argue that this conduct violates WAC 284–30–330(1) and amounts to bad faith. (Def. Mot. at 11–12; Def. Reply at 3–4.)

■ Defendants direct the court to only one case holding that a violation of WAC 284–30–330(1) amounted to bad faith. (*See* Def. Mot. at 7–8 (citing *Anderson v. State Farm Mut. Ins. Co.*, 101 Wash.App. 323, 2 P.3d 1029, 1034 (2000))). In that case, the Washington Court of Appeals held that an insurer acted in bad faith by failing to disclose the existence of UIM coverage when specific information before the insurer established that UIM coverage would likely apply, and the insurer had no reasonable basis for discounting that infor-

mation. *See Anderson,* 2 P.3d at 1034. Thus, an insurer that omits pertinent information about the policy is guilty of bad faith only if that omission was unreasonable in light of the circumstances existing at the time. *See id.; Pac. Coast Container, Inc. v. Royal Surplus Lines Ins. Co.,* No. C08–0278MJP, 2008 WL 2705588, at *7 (W.D.Wash. July 8, 2008); *see also HB Dev., LLC v. W. Pac. Mut. Ins.,* 86 F.Supp.3d 1164, 1184–85 (E.D.Wash.2015).

■ Even viewing the facts in the light most favorable to Defendants, *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097, no reasonable fact-finder could conclude that Cornhusker misrepresented pertinent policy provisions in bad faith, *see Anderson,* 2 P.3d at 1034. To begin, the facts do not establish that Cornhusker's conduct amounts to a misrepresentation. Cornhusker's reservation of rights letter fails to mention the "repairs exception" in its discussion of the residential construction exclusions, but on the previous page of the letter, Cornhusker quotes the entire residential construction exclusion from the Policy, including the "repairs exception" and the following title: *"EXCLUSION—CERTAIN RESIDENTIAL CONSTRUCTION [-] EXCEPT FOR REMODEL OR REPAIR."* (RoR at 11–12 (all emphasis in original).) Mr. Hudson's letter also includes the full title of the Policy's residential construction exclusion, and although the letter does not quote the "repairs exception," it quotes the equally important language regarding "original construction." (Hudson Letter at 2; *see* 3/30/15 Order at 22–24 (explaining the importance of the words "original construction" in interpreting the residential construction exclusion).) Defendants offer no authority for their assertion that Cornhusker's failure to specifically discuss the "repairs exception" amounts to a misrepresentation of the Policy, despite Cornhusker's quotation of the relevant language.

Furthermore, even if the lack of specific discussion amounts to a misrepresentation, Defendants fail to create a genuine issue of fact that Cornhusker's omission was unreasonable under the circumstances. *See Anderson,* 2 P.3d at 1034; *Keller,* 915 P.2d at 1145; *Pac. Coast Container, Inc.,* 2008 WL 2705588, at *7. Defendants' sole evidence in this regard is that Cornhusker knew that SQI had performed repairs in May 2005. (*See* Claim Notes at 1.) From this single piece of evidence, Defendants argue that Cornhusker should have known that it might owe coverage under the repairs exception. (*See* Def. Mot. at 11–12.) Yet Defendants point to no evidence that Cornhusker or anyone else involved in the underlying dispute at that time thought that SQI's 2005 repairs might be responsible for covered property damage. *See Osborn,* 17 P.3d at 1236; *Anderson,* 2 P.3d at 1034 (noting that UIM coverage would likely apply if the insured's account of events was accurate). Ledcor's tender focuses on SQI's initial construction of the roof and makes no mention of the 2005 repairs. (*See* Ledcor Tender.) Moreover, while ACOA's list of known construction defects and Mr. Colvard's report mention problems with the roof in 2007, neither document indicates that the 2005 repairs were responsible for property damage to another part of the Project.[17] (*See* ACOA Defect List at 2–3; Colvard Report at 7–8.) Accordingly, summary judgment is appropriate against Defendants' counterclaim for bad faith misrepresentations.

*ii. Failure to engage in settlement negotiations in good faith*

 An insurer defending under a reservation of rights has a duty to make a good faith effort to settle a claim, including an obligation to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available. *Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash.,* 162 Wash.App. 495, 254 P.3d 939, 944–45 (2011). The insured, however, retains authority over the ultimate choice regarding settlement because the insured may have to pay the settlement. *Tank,* 715 P.2d at 1138. Indeed, the insurer's obligations in this context do not necessarily require the insurer to pay the settlement or prohibit the insurer from considering coverage issues when deciding how much to contribute to a settlement. *See Specialty Surplus Ins. Co. v. Second Chance, Inc.,* 412 F.Supp.2d 1152, 1165–66 & n. 4 (W.D.Wash.2006); *Thomas V. Harris, Washington Insurance Law* § 19.05 (3d ed.2010). The insurer acts in good faith as long as its conduct is reasonable and does not demonstrate a greater concern for its own financial interest than its insured's financial risk. *See id.; Tank,* 715 P.2d at 1137–38. Here, as in all cases of alleged bad faith, context is important to a determination of reasonableness. *See Osborn,* 17 P.3d at 1236; *Keller,* 915 P.2d at 1145; *Truck Ins. Exch. of Farmers Ins. Grp. v. Century Indem. Co.,* 76 Wash.App. 527, 887 P.2d 455, 460 (1995).

 Defendants present the following evidence of bad faith in the settlement process: (1) Cornhusker did not give SQI's defense counsel settlement authority prior to the May 2008 mediation and referred to such mediation as a "waste of time" in an internal communication; (2) Cornhusker did not give counsel prior settlement authority with respect to the two mediations

---

**17.** As discussed above, the problems with the roof discovered in 2007 are, at most, damage to the roof itself and therefore not covered pursuant to the "your work" exclusion. *See supra* Part III.B.1.b. That exclusion also appears in Cornhusker's reservation of rights letter and in Mr. Hudson's letter to SQI's personal counsel. (*See* RoR at 10–11; Hudson Letter at 2–4.)

that occurred in 2009; (3) Cornhusker did not give counsel settlement authority before the 2010 mediation and later indicated that it viewed payment as a non-starter; and (4) Cornhusker offered to contribute only $71,786.00 at the 2014 mediation, despite some indication that it might have believed SQI's exposure was as much as $937,717.00. (*See* Def. Mot. at 3, 12–15); *supra* at 7–10. Although these acts might be unreasonable under the right circumstances, Defendants point to nothing to show that such circumstances existed in this case. *See Osborn,* 17 P.3d at 1236; *Keller,* 915 P.2d at 1145. In fact, Defendants point to no evidence of context whatsoever.

Furthermore, the contextual evidence in the summary judgment record indicates that Cornhusker acted reasonably. With respect to the 2008 mediation, Ledcor's invitation stated that Ledcor wanted to discuss SQI's obligation to defend and indemnify Ledcor for the claims Ledcor then faced in the ACOA Suit. (*See* 4/08 Ledcor Letter at 1–2.) Cornhusker employee Tom Dashel referred to that mediation as likely being a "waste of time"; however, his statement links that view to the fact that ACOA would not be participating in the mediation. (*See* 2d Martens Decl. ¶ 2, Ex. 9 ("If there is no involvement of the ... HOA, this is meaningless.").) Defendants present no evidence showing that Mr. Dashel's dim view of the 2008 mediation's utility was unjustified or unreasonable, nor do they offer any evidence linking this view to a lack of concern for SQI's interest. *See Tank,* 715 P.2d at 1137–38.

In addition, the record shows that at least through 2010 SQI's defense counsel, whose good faith in relation to SQI is not challenged here, believed that SQI had very little liability exposure, and that Ledcor and Admiral's demands to SQI were merely pro rata allocations of ACOA's claimed damages unsupported by evidence of SQI's responsibility for those damages. (*See* 6/9/10 Fallon Letter; 4/12/10 Fallon Letter; Messineo Decl. ¶ 8, Ex. C ("11/5/10 Fallon Letter"); *see also* Messineo Decl. ¶ 10, Ex. E.) He recommended attending the 2010 mediation to explain that SQI was not liable, and he indicated that SQI shared his view of liability. (*See* 4/12/10 Fallon Letter at 2 ("My recommendation is that we participate [in the June 7, 2010, mediation] as we did last time to have our client and expert explain why there is no liability on the part of SQI and then see what develops.").) The record also indicates that in the 2009 and 2010 mediations Admiral and Ledcor did not even have time to mediate with SQI. (*See* 6/9/10 Fallon Letter; 4/12/10 Fallon Letter at 1.) This contextual evidence casts Cornhusker's approach to the mediations as reasonable, not frivolous, unfounded, or self-interested. *See Osborn,* 17 P.3d at 1236; *Keller,* 915 P.2d at 1145. Furthermore, although Defendants make much of Cornhusker's failure to give counsel settlement authority prior to the 2008, 2009, and 2010 mediations (*see, e.g.,* Def. Mot. at 12–13), Defendants offer no authority for the proposition that such conduct, by itself, constitutes evidence of unreasonable behavior, and the court is aware of none.

Finally, the court rejects Defendants' contention that Cornhusker's offer at the 2014 mediation was unreasonably low and indicative of bad faith. (*See* Def, Mot. at 1315.) Washington law contains almost no guidance regarding an insurer's duty to settle and, in particular, to contribute funds to settlement in the context of a defense under a reservation of rights. *See Second Chance, Inc.,* 412 F.Supp.2d at 1165–66 & n. 4; Harris, *Washington Insurance Law* § 19.05. Thus, as Judge Coughenour recognized in *Second Chance, Inc.,* an insurer's duty in this context is defined by *Tank's* general requirement that the insurer refrain from conduct dem-

onstrating a greater concern for its own financial interest than its insured's financial risk. *See Second Chance, Inc.,* 412 F.Supp.2d at 1165–66 & n. 4 (citing *Tank,* 715 P.2d at 1137–38).

Although the lack of clarity in the law gives the court pause, summary judgment is nevertheless appropriate here. Nothing in *Tank* requires insurers in this context to ignore whether coverage exists under their policies. *See Tank,* 715 P.2d at 1137–38; *Second Chance, Inc.,* 412 F.Supp.2d at 1165–66 & n. 4 ("*Tank* permits an insurer at least to consider *whether* it owes a settlement payment when it considers the *amount* of such a payment." (emphasis in original)). Cornhusker has maintained from the outset of this dispute that coverage likely does not exist due to the residential construction and "your work" exclusions. (*See* RoR; *see also* Hudson Letter.) Now, after more than seven years of litigation involving the Project, Defendants still have presented no evidence of covered property damage, and the court has found that no coverage exists under any of the policies. *See supra* Part III.B.1.b.; (3/30/15 Order at 25.) Moreover, Defendants have offered nothing to indicate that at the time of the 2014 mediation Cornhusker had reason to believe that it owed coverage under the policies. The court therefore concludes that, at least in these narrow factual circumstances, Washington courts would not find a triable issue regarding whether Cornhusker demonstrated a greater concern for its own financial interests than SQI's financial risk. *See Tank,* 715 P.2d at 1137–38; *Second Chance, Inc.,* 412 F.Supp.2d at 1165–66 & n. 4; Harris, *Washington Insurance Law* § 19.05. Accordingly, the court grants summary judgment on and dismisses Defendants' counterclaim for bad faith breach of the duty to settle.

### iii. Failure to conduct a reasonably prompt investigation

■ Defendants also attempt to establish bad faith by arguing that Cornhusker failed to conduct a reasonably prompt investigation into SQI's claims. (*See* Def. Mot. at 2, 14.) " 'The implied covenant of good faith and fair dealing in the policy should necessarily require the insurer to conduct any necessary investigation in a timely fashion and to conduct a reasonable investigation before denying coverage.' " *Coventry Assocs. v. Am. States Ins. Co.,* 136 Wash.2d 269, 961 P.2d 933, 938 (1998) (quoting 1 Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* § 2.05, at 38 (3d ed.1995)); *Lakehurst Condo. Owners Ass'n v. State Farm Fire & Cas. Co.,* 486 F.Supp.2d 1205, 1213 (W.D.Wash. 2007) ("The duty to act in good faith requires the insurer to act reasonably in … investigating the claim.") Defendants' only evidence of Cornhusker's unreasonable conduct in this regard is an objection to interrogatories in this case in which Cornhusker states that it "has not completed its investigation of the facts related to this case, discovery or preparation for trial." (Def. Mot. at 2, 18 (citing 2d Martens Decl. ¶ 2, Ex. 1 ("Corn. Disc. Resp.") at 1).)

■ This evidence is insufficient to create a genuine dispute of material fact that Cornhusker's investigation was unreasonably delayed. *See Scott,* 550 U.S. at 380, 127 S.Ct. 1769. Defendants point to no case from any jurisdiction where analogous evidence was deemed sufficient to support an inference of unreasonable conduct. (*See* Def. Mot.; Def. Resp. Def. Reply.) That absence is not surprising. Allowing Defendants to present their bad faith investigation claim to a jury based on nothing more than a discovery objection such as Cornhusker's would effectively dis-

able insurers from conducting any discovery or investigation in litigation with insureds. (*See* Corn. Disc. Resp. at 1.) As far as the court is aware, the law imposes no such disability on insurers. Moreover, the record indicates that Cornhusker started investigating the claims against SQI immediately upon receipt of Ledcor's tender, dispatching Mr. Colvard to investigate the roof within a day. (*See* Claim Notes at 1.) Mr. Colvard's report was finished within a three weeks (*see* Colvard Report at 1), and within three more weeks Cornhusker sent SQI the reservation of rights letter (*see* RoR at 1). Defendants point to no evidence or authority to show that such an investigation was unreasonable, particularly in a complex, multi-party construction defect dispute such as existed here. *See supra* Part II. Accordingly, the court grants summary judgment in favor of Cornhusker on Defendants' claim of bad faith investigation.

### iv. Failure to affirm or deny coverage within a reasonable period of time

In a related vein, Defendants suggest that Cornhusker committed bad faith by failing to make a decision affirming or denying coverage within a reasonable period of time. (*See* Def. Mot. at 2, 14.) Washington insurance regulations list "failing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted" as an unfair or deceptive act or practice in the business of insurance. WAC 284–30–330(5). Here, Defendants point out Cornhusker's statement in this litigation that it "never made any 'decision to approve or deny benefits to SQI related to the … Project and/or the Admiral Way Litigation under the Policies.'" (Corn Disc. Resp. at 2 (quoting SQI's request for production no. 3); *see* Def. Mot. at 2, 14, 18.) Defendants direct the court to no authority showing how a violation of WAC 284–30–330(5) intersects with the common law tort of bad faith in the context of a reservation of rights case, and the court's own research has revealed none.

■ Nevertheless, whether or not a violation of WAC 284–30–330(5) constitutes bad faith, Defendants' are not entitled to survive summary judgment on the record before the court. Defendants point to no evidence and provide no analysis or authority to show that Cornhusker's conduct was unreasonable. Cornhusker defended SQI under a reservation of rights for roughly six years—from before the beginning of the Contractor Suit, in 2008, through April 2014, when SQI settled with Ledcor and Admiral and assigned its rights against Cornhusker to them. (*See* Corn. Mot. at 13; Corn. Resp. at 5; RoR; 2d Martens Decl. ¶ 2, Ex. 9; Messineo Decl. ¶¶ 5–6, Ex. A; Ledcor Compl.; Stip. Judgment.) Approximately two months after that settlement, Cornhusker unequivocally denied coverage by filing this lawsuit asserting that no coverage exists under the subject policies. (*See* Compl.) Defendants present nothing from which a fact finder could conclude that Cornhusker's conduct constitutes unreasonable delay. *See Scott*, 550 U.S. at 380, 127 S.Ct. 1769. The court therefore grants summary judgment in Cornhusker's favor on this aspect of Defendants' bad faith claim.

### v. Improperly comingling defense and coverage files and engaging in discovery abuses

■ Finally, Defendants contend that Cornhusker committed bad faith by comingling its defense and coverage files related to SQI's claim and by failing to produce its claims filed during discovery in this case. (*See* Def. Mot. at 2–3, 23–25.) Defendants provide no authority showing that either of these types of conduct constitutes bad faith, and the court has located none. Defendants cite *Sharbono v.*

*Universal Underwriters Insurance Co.,* 139 Wash.App. 383, 161 P.3d 406 (2007), for the proposition that an insurer's unreasonable refusal to share its claims file amounts to bad faith. (*See* Def. Mot. at 23–24.) In that case, however, the insurer's refusal occurred in the context of the underlying litigation between the insured and the third-party claimant after the insured and the claimant requested the claims file to aid in settlement. *See Sharbono,* 161 P.3d at 411–12, 419–22. In the subsequent dispute between the insurer and the insured, the court of appeals affirmed the trial court's summary judgment ruling that the insurer's earlier refusal had been unreasonable and in bad faith. *See id.* Here, however, the insurer's challenged conduct occurred in the bad faith litigation (*see* Def. Mot. at 23), not in the underlying litigation. Defendants offer no justification for extending *Sharbono* to this context, and the court declines to do so.

With respect to their commingling claim, Defendants point to only the following evidence: Cornhusker claims examiner Rebecca Messineo signed the reservation-of-rights letter, Ms. Messineo stated in a 2010 email that she was assisting with coverage issues on SQI's claim, and Cornhusker identified Ms. Messineo in discovery in this matter as "Cornhusker's claims handler for SQI's defense." (*See* Def. Mot. at 3 & n. 5 (citing RoR at 13; 2d Martens Decl. ¶ 2, Ex. 7; Corn. Disc. Resp. at 5).) Defendants provide no analysis or authority to show how this evidence indicates bad faith, and the court finds Defendants' evidence insufficient to support the conclusion that Cornhusker acted in bad faith. *See Scott,* 550 U.S. at 380, 127 S.Ct. 1769. Furthermore, in the only case to which Defendants cite on this issue, the court ruled that assigning a single adjuster to defense and coverage functions does not constitute to bad faith. *Am. Capital Homes, Inc. v. Greenwich Ins. Co.,* No. C09–622–JCC, 2010 WL 3430495, at

*5–6 (W.D.Wash. Aug. 30, 2010). Accordingly, the court grants summary judgment against Defendants' claims that Cornhusker's discovery abuses and commingling amount to bad faith.

*d. Cornhusker did not violate the CPA*

■ A claim under the CPA requires proof of five elements: "(1) [an] unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 719 P.2d 531, 533 (1986). "A violation of WAC 284–30–330 constitutes . . . a per se unfair trade practice[,]" thereby satisfying the first element of a CPA violation. *Industrial Indem. Co. of Nw., Inc. v. Kallevig,* 114 Wash.2d 907, 792 P.2d 520, 529 (1990). Defendants base their CPA claim on their assertion that Cornhusker violated six provisions of WAC 284–30–330:

(1) Misrepresenting pertinent facts or insurance policy provisions, WAC 284–30–330(1);

(2) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, WAC 284–30–330(3);

(3) Failing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted, WAC 284–30–330(5);

(4) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, WAC 284–30–330(6);

(5) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising

under insurance policies, WAC 284–30–330(2); and

(6) Compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings, WAC 284–30–330(7).

(Def. Mot. at 16–18.) Cornhusker counters that it did not violate these provisions, and that even if it did, Defendants cannot show that any such violation caused injury to SQI's business or property. (*See* Corn. Mot. at 21.)

*i. Misrepresentation, unreasonable investigation, failure to affirm or deny coverage within a reasonable time, and bad faith settlement conduct*

These alleged CPA violations overlap with four aspects of Defendants' bad faith claim. *See supra* Part III.B.1.c. Defendants cite no new evidence in this context, nor do they provide any authority or argument indicating that the court should evaluate the evidence differently in this context. (*See* Def. Mot. at 17–19.) As such, the court grants summary judgment against these CPA claims for the reasons discussed above with respect to the corresponding bad faith claims. *See supra* Part III.B.1.c.

*ii. Failure to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies*

In support of this claim, Defendants offer an April 13, 2010, email exchange between Cornhusker personnel. (*See* Corn. Mot. at 17–18 (citing 2d Martens Decl. ¶ 2, Ex. 17 ("4/13/10 Emails")).) This exchange indicates that Cornhusker did not respond to Ledcor's October 2007 tender letter or Ledcor's April 2008 invitation to mediation. (*See* 4/13/10 Emails at 1 ("I

don't see in the file where there were any responses to the October 2007 letter or the April 23, 2008 letter.").) Defendants do not explain how this particular conduct injured SQI's business or property. Instead, Defendants state generally that all of "Cornhusker's unfair settlement practices and bad faith" forced SQI to (a) hire personal counsel to settle the claims against it and (b) to agree to a covenant judgment that has "impact[ed] SQI's reputation, good will, insurance rates, and insurability." (Def. Mot. at 16, 18–19 (citing 2d Gardner Decl. ¶¶ 2–9).)

█ Summary judgment is appropriate against this claim because Defendants fail to create a genuine dispute of fact regarding causation. *See Hangman Ridge Training Stables, Inc.*, 719 P.2d at 533. Defendants only evidence of injury to SQI's business or property are the fees that Cornhusker paid to its private counsel and the impact of the covenant judgment on SQI's business interests. (*See* Def. Mot. at 16, 18–19 (citing 2d Gardner Decl. ¶¶ 2–9).) This evidence derives exclusively from Mr. Gardner's declaration. Yet neither Mr. Gardner's declaration nor any other evidence of which the court is aware plausibly links Cornhusker's failure to respond to Ledcor's October 2007 and April 2008 letters to SQI's asserted injuries. (*See* Gardner Decl. ¶¶ 2–9.) After receiving Ledcor's letters, Cornhusker hired defense counsel for SQI. (*See* Messineo Decl. ¶¶ 5–6, Ex. A; 2d Martens Decl. ¶ 2, Ex. 9; 4/08 Ledcor Letter.) Defense counsel attended at least four mediations over the next six years, including the mediation to which Ledcor's April 2008 letter pertained. *See supra* at 7–9. SQI did not hire personal counsel until just before the final mediation in March 2014 and did not settle with Ledcor and Admiral until shortly after that mediation. (*See* Def. Reply at 3–

4; Stip. Judgment; 2d Martens Decl. ¶ 2, Ex. 18; Hudson Letter at 1.)

Defendants offer no way for a reasonable fact-finder to trace Cornhusker's non-response in October 2007 and April 2008 through six years of litigation, defense, and mediation and find that non-response to have caused SQI to hire personal counsel and agree to a covenant judgment. Thus, even if Cornhusker violated WAC 284–30–330(2), which the court does not decide, Defendants present insufficient evidence to show that such violation caused injury to SQI's business or property. *See Hangman Ridge Training Stables, Inc.*, 719 P.2d at 533. Accordingly, the court dismisses Defendants' CPA claim concerning Cornhusker's alleged violation of WAC 284–30–330(2).

*iii. Compelling a first party claimant to initiate or submit to litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such action*

This claim fails in light of the court's foregoing rulings. Because Defendants have failed to create a genuine dispute with respect to coverage, *see supra* Part III.B.1.b., they cannot show that Cornhusker compelled SQI to submit to litigation by offering substantially less in settlement than the amount ultimately recovered on the Policy in this litigation. *See* WAC·284–30–330(7).

*e. Cornhusker did not violate IFCA*

IFCA establishes a cause of action for "[a]ny first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or a payment of benefits." RCW 48.30.015(1). Defendants appear to concede that Cornhusker has not "denied a claim for coverage or a payment of benefits" in the traditional sense. (*See* Def. Mot. at 21–23.) They assert, however, that Cornhusker's alleged violations of the Washington insurance regulations list-

ed in subsection (5) of IFCA constitute a violation of IFCA, and that Cornhusker denied payment of benefits within the meaning of IFCA when Cornhusker offered an unreasonably low amount to settle the Contractor Suit. (*Id.* (citing *Langley v.· GEICO Gen. Ins. Co.*, 89 F.Supp.3d 1083, 1090–92 (E.D.Wash.2015) (holding that an insured may maintain a cause of action under IFCA for a violation of a Washington insurance regulation listed in subsection (5) of IFCA); *Morella v. Safeco Ins. Co. of Ill.*, No. C12–0672JLR, 2013 WL 1562032, at *3 (W.D.Wash. Apr. 12, 2013) (holding that an unreasonably low settlement offer amounts to a denial of benefits under IFCA))); *but see Seaway Props., LLC v. Fireman's Fund Ins. Co.*, 16 F.Supp.3d 1240, 1254–55 & n. 5 (W.D.Wash.2014) (holding that a violation of Washington insurance regulations is not a violation of IFCA and collecting cases). The court need not decide the legal issues that Defendants raise because even if the court were to side with Defendants on those issues, summary judgment would nevertheless be appropriate against Defendants' IFCA claim.

· The court turns first to Defendants' IFCA claim based on alleged violations of Washington insurance regulations. IFCA references the following regulations:

(a) WAC 284–30–330, captioned "specific unfair claims settlement practices defined";

(b) WAC 284–30–350, captioned "misrepresentation of policy provisions";

(c) WAC 284–30–360, captioned "failure to acknowledge pertinent communications";

(d) WAC 284–30–370, captioned "standards for prompt investigation of claims";

(e) WAC 284–30–380, captioned "standards for prompt, fair and equitable

settlements applicable to all insurers"; or

(f) An unfair claims settlement practice rule adopted under RCW 48.30.010 by the insurance commissioner intending to implement this section. The rule must be codified in chapter 284–30 of the Washington Administrative Code.

RCW 48.30.015(5). Defendants provide no additional facts or analysis supporting their claim that Cornhusker violated IFCA by violating one of these regulations. Instead, Defendants state only that "the previously cited and discussed facts ... establish as a matter of law Cornhusker's violation of each of the regulations enumerated under [IFCA subsection (5)]." (Def. Mot. at 22.) Thus, Defendants' regulation-based IFCA claim merely repeats Defendants' other extra-contractual claims related to WAC provisions. *See supra* Part III.B.1.b., c. For the reasons discussed above with respect to those claims, the court grants summary judgment in Cornhusker's favor on Defendants' regulation-based IFCA claim.[18]

 Defendants' claim that Cornhusker unreasonably denied payment of benefits likewise must fail. The court has already found that Defendants' have failed to raise a genuine dispute regarding coverage and the reasonableness of Cornhusk-er's settlement practices. *See supra* Part III.B.1.b., c.ii. Accordingly, Defendants cannot now maintain an IFCA claim based on the notion that Cornhusker offered too little in settlement. *See Morella,* 2013 WL 1562032, at *3. The court therefore dismisses Defendants' IFCA claim.

2. *Admiral's and Ledcor's Independent Counterclaims*

In addition to asserting counterclaims as SQI's assignees, both Admiral and Ledcor have asserted their own counterclaims against Cornhusker for breach of contract, violation of the CPA, and bad faith (Ledcor only). (Admiral Ans. ¶ 4; Ledcor Ans. ¶ 4.) These independent counterclaims rely on Defendants' contention that Admiral and Ledcor are additional insureds under the policies that Cornhusker issued to SQI, and that Cornhusker therefore should have indemnified Admiral and Ledcor in the ACOA Suit. (*See id.;* Def. Resp. at 13–16.) Cornhusker argues that the court should dismiss Admiral's and Ledcor's counterclaims on several grounds, including that the extra-contractual counterclaims are time barred. (*See* Corn. Mot. at 21–27.) The court agrees. Admiral's and Ledcor's contractual counterclaims fail because none of the subject policies provide coverage[19] (*see* 3/30/15 Order); *supra*

---

**18.** To the extent the regulations enumerated in IFCA present distinct factual or legal questions from those raised by Defendants' previous claims, the court finds that Defendants have failed to meet their summary judgment burden of showing an IFCA violation because they have not cited any facts or engaged in any analysis to demonstrate the merit of their claims to the court or to Cornhusker. *See Galen,* 477 F.3d at 658.

**19.** Ledcor also asserts that Cornhusker breached its duty to defend Ledcor (*see* Ledcor Ans. ¶ 4); however, Defendants do not dispute Cornhusker's assertions that (1) under the policies Cornhusker had no duty to defend

additional insureds until their imputed liability for SQI's conduct "exceeds the combined limits of other insurance or a $1 million [self-insured retention], whichever is greater" (Corn. Mot. at 26–27 (citing 2d Sparling Decl. ¶¶ 2–3, Ex. A at 17, 23, Ex. B at 17, 23; Policy at 17, 23)), and (2) Defendants cannot show that Cornhusker's duty was implicated in this case given that they stipulated to $747,785.00 as the amount of damage from SQI's work (*id.* at 27). (*See* Def. Resp. at 15 (responding to this argument only by observing that SQI was a primary insured under its policies with Cornhusker).) As such, summary judgment is appropriate against Ledcor's counterclaim for breach of the duty to defend.

Part III.B.1.b., and their extra-contractual claims are time barred.

■ Under Washington law, a cause of action for insurance bad faith has a three-year statute of limitations. *Moratti*, 254 P.3d at 942 (citing RCW 4.16.080; *Butler*, 823 P.2d at 503) (observing that Washington applies a three-year statute of limitations to tort claims and that insurance bad faith sounds in tort). A four-year statute of limitations applies to CPA claims. RCW 19.86.120. These periods begin to run, at the latest, when the putative insured settles with the underlying claimant. *See Moratti*, 254 P.3d at 942; *Walker v. Metropolitan Prop. & Cas. Ins. Co.*, No. C12–0173JLR, 2013 WL 942554, at *3–5 (W.D.Wash. Mar. 8, 2013). Ledcor and Admiral settled with ACOA in July 2009 (*see* Ledcor Ans. ¶ 3.9; Admiral Ans. ¶ 3.11), but asserted their present extra-contractual counterclaims against Cornhusker five years later in their July 2014 answers to Cornhusker's complaint (*see* Ledcor Ans. ¶ 4, at 14; Admiral Ans. ¶ 4, at 14). Thus, even if Ledcor and Admiral qualify as additional insureds,[20] the statutes of limitations bar Ledcor's and Admiral's independent extra-contractual counterclaims.

### 3. *Defendants' Counterclaims for Reformation*

All three Defendants assert the following counterclaim in their answers:

> To the extent the Court determines that the actual coverage provided under the Cornhusker's [sic] policies did not comply with the requirements and intent of the parties to the subcontract between Ledcor and SQI that SQI's liability insurance should defend and indemnify SQI, Ledcor, and Admiral Way for any and all claims for property damages and consequential damage arising out of or connected with SQI's work on the Admi-

ral Way Mixed–Use on a primary basis, said policies should be reformed.

(SQI Ans. ¶ 5.1; Admiral Ans. ¶ 5.1; Ledcor Ans. ¶ 5.1.) Defendants argue for dismissal of these counterclaims on the bases that (1) Defendants lack evidence to merit reformation, and (2) the intent of parties to a separate contract—the subcontract between SQI and Ledcor—is irrelevant to whether Cornhusker's contracts (policies) with SQI should be reformed. (*See* Corn. Mot. at 27–28.) Faced with this argument, Defendants reinterpret their reformation claims as requesting that the court give effect to the so-called "repairs exception" to the Policy's residential construction exclusion. (*See* Def. Resp. at 16–17.)

■ Cornhusker is entitled to summary judgment against Defendants' reformation counterclaims. "Reformation is an equitable remedy employed to bring a writing that is materially at variance with the parties' agreement into conformity with that agreement." *Denaxas v. Sandstone Ct. of Bellevue, L.L.C.*, 148 Wash.2d 654, 63 P.3d 125, 132 (2003) (citing *Akers v. Sinclair*, 37 Wash.2d 693, 226 P.2d 225 (1950)). "A party may seek reformation of a contract if (1) the parties made a mutual mistake or (2) one of them made a mistake and the other engaged in inequitable conduct." *Id.* (citing *Wash. Mut. Sav. Bank v. Hedreen*, 125 Wash.2d 521, 886 P.2d 1121 (1994)). "The party seeking reformation must prove the facts supporting it by clear, cogent and convincing evidence." *Id.* (citing *Akers*, 226 P.2d 225; *Kaufmann v. Woodard*, 24 Wash.2d 264, 163 P.2d 606 (1945)). Defendants point to no evidence that Cornhusker and SQI shared a mutual mistake or that SQI made a mistake and Cornhusker engaged in inequitable conduct during the formation of their contracts. Furthermore, Defendants offer no legal authority for the proposition that the

---

**20.** The court expresses no opinion on this subject.

intent of SQI and Ledcor in forming their subcontract is relevant to whether reformation is appropriate with respect to SQI's separate contracts with Cornhusker. Accordingly, the court grants summary judgment in favor of Cornhusker on Defendants' counterclaims for reformation.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES Defendants' motion, GRANTS Cornhusker's motion, DECLARES that SQI's policies with Cornhusker provide no coverage for the losses at issue in the Contractor Suit, DISMISSES Defendants' counterclaims, and DENIES as moot the pending motions in limine (Dkt. ## 93, 94).